THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GWENDOLYN FERGUSON, Defendant-Appellant.

First District (5th Division)    Nos. 79-1634, 80-1061 cons.

Opinion filed December 18, 1981.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Adrienne Noble Nacev, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant, who was charged by information with the offenses of murder and armed violence, was convicted of murder and sentenced to 20 years imprisonment. Defendant later filed a post-conviction petition alleging that she suffered a denial of constitutional rights at her trial. The trial court denied this petition, which was filed under section 72 of the Civil Practice Act rather than the Post-Conviction Hearing Act. Both appeals are consolidated for our review.

Defendant contends that (1) she was not proved guilty of murder beyond a reasonable doubt; (2) the trial court erred in not suppressing her post-arrest statements; (3) the trial court improperly admitted certain evidence in violation of Supreme Court Rule 412(a)(ii); and (iv) the trial court incorrectly allowed the State to question defendant about, and comment on defendant's failure to tell the police, before she was arrested and received her *Miranda* warnings, that she killed the deceased in self-defense.[1]

On August 10, 1978, Eliza Williams was shot three times and killed in her home. Her friend, Gwendolyn Ferguson, was charged with murder and armed violence. The relevant testimony at the suppression hearing and the trial follows.

I. Hearing to Suppress Defendant's Pretrial Statements

Sergeant Timothy Tidmarsh stated that at approximately 10 p.m. on August 14, 1978, he responded to a call of a woman who wished to turn herself in to the police. He proceeded to a restaurant on South Halsted Street where he met defendant. In response to his questions, she said that she had called the police and was wanted for the murder of Eliza Williams. Tidmarsh read her the *Miranda* rights and asked if she wished

---

[1] Defendant's counsel, during oral argument, waived this last contention in light of *Jenkins v. Anderson* (1980), 447 U.S. 231, 65 L. Ed. 2d 86, 100 S. Ct. 2124.

to make a statement. She replied that she did not. At about this time, Officers Maxwell and Van Shaik arrived at the restaurant and took defendant into custody.

Officer Maxwell testified that when he arrived at the restaurant, he saw Tidmarsh speaking to defendant. He further testified that he remained at the restaurant for 5 to 10 minutes and then transported defendant to the Fifth District station. It took 5 to 10 minutes to make the trip. After his arrival, he wrote an arrest report. He remained at Fifth District for 15 minutes and then transported defendant to Area Two Homicide. This trip took approximately 15 minutes. His testimony indicated that approximately 50 minutes elapsed between his arrival at the restaurant with Van Shaik and their arrival at Area Two Homicide. Maxwell stated that he could not recall if defendant appeared to have been drinking that night but admitted that he had typed up an arrest report indicating that she had.

Investigator Dennis Banahan stated that at approximately 11 p.m. on August 14 he was in Area Two Homicide in an interview room with defendant. He spoke to the arresting officers Maxwell and Van Shaik, who advised him that defendant had said she was wanted for the murder of Eliza Williams but that she had then stated that "she didn't want to make any further statement there." Before speaking to defendant, Banahan telephoned Sergeant Tidmarsh, who told him that defendant did not want to make a statement in the restaurant.

Banahan further testified that he advised defendant that he was an investigator with the homicide section. He gave her the *Miranda* rights and explained them to her. Defendant said that she understood. He stated that she appeared sober and that the arresting officers did not tell him that she had been drinking. After asking her if she wanted to tell him about the murder of Eliza Williams and receiving an affirmative reply, he interviewed her for 15 to 25 minutes. During this time she gave an oral statement. He then left the room, returned with an Assistant State's Attorney, and asked defendant if she would give a written statement. She refused to do so, stating that she thought it would be better to speak to a lawyer before giving a written statement. Banahan admitted that even after she requested counsel, he continued to question her concerning her oral statement.

After hearing the testimony and argument, the trial court held that the statements made to Tidmarsh in the restaurant were admissible because they were not the result of custodial interrogation. The court further ruled that the admissibility of the answers defendant gave to Banahan's questions after she told Tidmarsh that she did not wish to make a statement depended on the "persistence of the questioning, perhaps use of subterfuge." The court held:

"From all I can gather from the testimony as I heard it here, the defendant very readily answered the questions of Officer Banahan as to the oral statement, and there appeared to be no coercive methods used at all. Accordingly, the motion to suppress the statement will be denied."

Additionally, the court stated that since the State had agreed not to use statements given after defendant expressed her desire to obtain a lawyer, no order would be entered concerning those statements.

## II. The Trial

### A. State's Case in Chief

Michael Williams, the victim's brother, testified that at 3:35 p.m. on August 10, he and his sister, Gail Campbell, went to visit Eliza Williams at her home on South Wallace Street where Eliza, defendant, and their respective children lived. No one answered the doorbell and the doors were locked. Michael then opened up the screen door through a slit in the screen and he and Gail entered the house. They went to Eliza's bedroom and found her lying on the bed. He thought that she was asleep and called out her name. Receiving no response, he shook her arm and then noticed that there was blood on his hand. He told Gail to call the police. While she was calling the police, he looked under Eliza's mattress for a gun that he knew she kept there. He also was aware that she kept an automatic gun in a dresser drawer. Finding no gun under the mattress, he looked under her bed and found it. He picked it up with a plastic bag, opened the chamber and noticed three empty cartridges. He then replaced the gun under the bed.

Michael and Gail then checked the house to see if anyone was there. They saw no one, but did find some coins lying on the floor near the back door. The police arrived approximately 10 to 15 minutes later.

Michael further testified that on August 14, defendant telephoned him and asked to speak to Eliza. When he told her that Eliza had been badly hurt, she replied that she was going to "catch the next bus and come over there."

Defendant's attorneys objected to this testimony, contending that the State had failed to include this oral statement in its answer to discovery and that the conversation was prejudicial to the defense theory of self-defense. Defense counsel moved for a mistrial. In denying this motion, the trial court held that the State was not required to furnish every oral statement made by defendant and, furthermore, that the defense objection was untimely because it was made after the witness had answered.

Michael concluded his testimony by stating that defendant and Eliza

had lived together for 10 years and at the South Wallace premises for two years.

Gail Campbell, Eliza's sister, testified to substantially the same circumstances as Michael. Additionally, she stated that on August 9 she saw Eliza with defendant's medical eligibility card. Eliza told her that she would be returning the card to defendant the next day. On August 10, after Eliza's death, Gail examined Eliza's purse but was unable to locate the card.

Officer Edward Barkowski testified that when he arrived on the scene, he observed Eliza lying on the bed with bloodstains on her right side. He also saw a gun underneath the bed. When he inspected the body of the deceased, he saw apparent gunshot wounds in the right side of the jaw, the right outer arm, and the right side of her chest. Further, he observed hair curlers, cosmetic jars, several pins, a wallet, coins, a hairpin, and a utility bill on the bed.

Investigator Dennis Banahan testified that at approximately 4:10 p.m. on August 10, he and Investigator Thomas McKenna were assigned to the fatal shooting of Eliza Williams. When they arrived at the South Wallace address where the incident had occurred, they examined the scene and spoke to Eliza's brother and sister. Banahan observed Eliza lying across the bed in the rear bedroom and noted two apparent gunshot wounds, one to the right cheek and the other through the right arm. He also noticed coins on the bed next to the victim and at the back door. He further testified that Michael had found, in addition to the gun under the bed, a .25-caliber automatic in a drawer on the right side of the dresser in the bedroom. It contained three live rounds in the magazine and one live round chambered.

Banahan further testified that on August 14, Michael informed him that defendant planned to come to the victim's home. After receiving this information, he went to the South Wallace address. Defendant was not present because she had left to go to the store. While Banahan was waiting for her to return, his office informed him by telephone that a woman had turned herself in for the murder of Eliza Williams. He then proceeded to the Area Two Homicide office, arriving there about 11 p.m., and saw defendant with the arresting officers, Maxwell and Van Shaik. After interviewing the officers, he went into a room, introduced himself, and advised defendant of her constitutional rights. She agreed to answer questions.

According to Banahan, defendant initially stated that she had been having an ongoing argument with Eliza concerning sharing expenses for the house on South Wallace Street; that when she went to the South Wallace home she had not been there for three weeks; that she returned

there to pick up from Eliza a medical eligibility card which she needed to obtain her public aid check; that after obtaining the check, she returned to the house and she and Eliza began to argue about sharing of expenses; that the argument turned into a physical altercation and Eliza reached under the mattress at the head of her bed, pulled out a gun; that a scuffle took place; that in the midst of the scuffle at the head of the bed, Eliza was shot.

Banahan further testified that when he described the gunshots and pointed out that the position of the body was inconsistent with her account of the incident, defendant stated: "F___ it, there's no use lying. I knew Eliza kept a gun under the mattress and I grabbed the gun while she was putting rollers in her hair and shot her." She also stated that she threw the gun on the bed but it hit the wall and fell under the bed. Further, she stated that she took some change and dropped some of it on the floor on the way out.

Banahan testified that his initial conversation with defendant lasted approximately 20 to 25 minutes. On cross-examination, he stated that at about 11:50 p.m. he obtained an Assistant State's Attorney, who spoke to defendant. At that time, she declined to make a statement and the Assistant State's Attorney ceased questioning her. Banahan, however, continued asking her questions to complete the statement. Further, he admitted that the autopsy found three gunshot wounds, even though he only saw two. Finally, Banahan admitted that the information he received regarding the original positions of the body and the .38-caliber gun came from Michael.

It was stipulated that if Doctor F. A. Malec, a pathologist with the Cook County medical examiner's office, was called to testify he would state that he performed an autopsy on Eliza's body which revealed three gunshot wounds. He could not determine the order in which they occurred. The stipulated testimony described the nature of the wounds and the direction the bullets had travelled. There was no blackening or speckling present on any of the wounds, which could indicate the shooting had not occurred at very close range.

The State rested. Defendant's motion for a directed verdict was denied.

B. Defense's Case

Officer Robert Maxwell reiterated his testimony given at the Motion to Suppress hearing that the arrest report he prepared revealed that defendant had been drinking on August 14.

Defendant testified that she first met Eliza in high school in Orange, Texas, and that they had been close friends since that time. In 1967, after they both graduated, Eliza left Orange and moved to Germany with her

husband. Eliza wrote her in 1968, stating that she was alone and pregnant, and asked her to come to Chicago to help her. Defendant moved to Chicago and lived with her until her death.

One evening in the spring of 1974, defendant saw Eliza with her clothes splattered with blood. When she asked what had happened, Eliza replied, "Nothing, but I had to kill somebody." Defendant knew that Eliza owned three weapons—a .38 Smith & Wesson, a .25 automatic, and one other gun. She further testified that in February of 1978, when she was confined to the apartment with a broken foot, Eliza came into her bedroom carrying a .38 and asked her if she had called anyone to come over, since the doorbell was ringing. Eliza stated that she would take care of the matter, and left. Later that evening, defendant received a telephone call from Theresa Dammons, a former co-worker, who said that while she was trying to bring her a meal earlier in the day, she had been met at the house by Eliza, who pulled a gun and threatened to set two dogs on her.

Defendant further testified that prior to August 10, she had been living away from her apartment in Eliza's house for three weeks but on August 10, 1978, she returned to the house to get her medical eligibility card from Eliza. Eliza handed her the card through a crack in the door and she left to cash a check. After she returned she told Eliza that she had decided to permanently move to a new apartment because she felt that she had been "used and manipulated". Eliza "went all off" and began hollering. Defendant walked away to get water.

Defendant further stated that when she turned around, Eliza was standing about eight feet away, pointing a gun at her and asking, "Why the hell you think I am using you?" The gun she held was the .38 caliber revolver found under the bed. Defendant knew that when Eliza became upset she "meant business" and she felt Eliza was going to shoot her. When she thought the gun was being cocked, she jumped toward Eliza. They began to struggle and Eliza kept threatening to kill her. As they struggled in the bedroom, near the door, the gun went off and dropped to the floor. When Eliza bent to pick up the gun, defendant kicked it away. Eliza then moved to the bed, lifted up the mattress and then turned to the dresser, still threatening defendant. At this point, Eliza was standing between the bed and dresser.

Defendant further testified that she was aware that Eliza often kept a gun in the dresser and also knew that Eliza owned three guns. Therefore, when she saw Eliza push up the mattress with her right hand and then bend toward the dresser drawer, defendant picked the gun off the floor and fired twice. Eliza then sat on the edge of the bed with her hands on her head and began to fall back. Defendant threw the gun and left through the back door.

Defendant stated that four days later she returned to Eliza's home

and talked to Eliza's sister, Cynthia, who told her that she was wanted for Eliza's murder. She then went to a tavern and had some drinks. Later, she went to a restaurant, where she called the police and waited for them to come. When Sergeant Tidmarsh arrived at the restaurant, she told him that she heard that the police were looking for her for murder but she wanted to explain it was not actually murder. She further informed him that she wanted to talk to a lawyer or someone in authority. Later she was taken to Area Two Homicide, where she saw Investigator Banahan and again asked for a lawyer. He kept insisting that she could talk to him and he then read something to her out of a pamphlet. She told him about the argument—that Eliza pulled a gun on her, a struggle occurred and the gun went off and that she picked up the gun. Then, she stopped talking to him. She denied saying "F___ it, there is no use lying."

Theresa Dammons, a friend and co-worker of defendant, testified in corroboration of defendant's statement regarding the February 1978 incident. She stated that when she went to defendant's home to bring her food, Eliza became angry, ordered her to leave, and threatened her with a gun and several dogs.

C. State's Rebuttal

Michael Williams testified that he never saw his sister shoot anyone and he saw no signs of a scuffle at Eliza's house on August 10.

The jury found defendant guilty of murder; she appeals.

OPINION

I

Initially, we find it appropriate to examine defendant's contention that the trial court erred in declining to suppress her post-arrest statements. She asserts that her statements to Sergeant Tidmarsh and Investigator Banahan were not voluntary. In support of this conclusion she urges that she was deprived of her right to cut off questioning and remain silent because Investigator Banahan interrogated her about the murder after she told Sergeant Tidmarsh that she "didn't want to make a statement." We reject her argument that Tidmarsh's or Banahan's questioning was improper and that her answers should have been suppressed.

■■ The admissibility of custodial statements made after an individual has decided to remain silent depends on whether his " 'right to cut off questioning' " has been " 'scrupulously honored.' " (*Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321, 326.) In *Mosley*, defendant was arrested for robbery. At the police station, he was given *Miranda* warnings and questioned. When defendant invoked his right of silence, interrogation stopped. Two hours later, another officer

questioned defendant about an unrelated robbery-murder, and defendant implicated himself in the murder. The court allowed the statement into evidence, and defendant was convicted of murder. In ruling that the admission of the statement did not violate defendant's right to cut off questioning, the Supreme Court interpreted a holding of *Miranda v. Arizona* (1966), 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1627-28, which stated as follows:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

The *Mosley* court ruled that interpreting this passage literally "would lead to absurd and unintended results." (423 U.S. 96, 102, 46 L. Ed. 2d 313, 320, 96 S. Ct. 321, 326.) On one side, to allow continued interrogation after a momentary cessation would frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the suspect's will. Conversely, a "blanket prohibition" from further interrogation, regardless of circumstances, would unduly impede police investigative activity. Consequently, the court concluded that its determination should focus on whether defendant's right to cut off questioning was scrupulously honored. 423 U.S. 96, 102-03, 46 L. Ed. 2d 313, 320-21, 96 S. Ct. 321, 326.

The three circumstances that the *Mosley* court emphasized in determining that defendant's right to silence was scrupulously honored were the passage of a significant time between the sessions of questioning (two hours), provision of a fresh set of *Miranda* warnings, and renewed questioning by a different officer as to a completely different offense.

In *People v. Faison* (1979), 78 Ill. App. 3d 911, 397 N.E.2d 1233, factors in determining whether a defendant's right to remain silent was scrupulously honored were found to be whether there was a significant period of time (during which there was a complete cessation of questioning) between the defendant's exercise of his right to remain silent and the reinterrogation; whether the reinterrogation was preceded by a fresh set of *Miranda* warnings; whether a different officer conducted the second questioning; and whether a different subject matter was involved in the second questioning. Additionally, in *People v. Savory* (1980), 82 Ill. App. 3d 767, 403 N.E.2d 118, this court found, as another factor tending to show that defendant's right to remain silent was not violated by the resumption of interrogation, the presence of something in the record which would justify or explain defendant's reconsideration of his decision to remain silent.

Applying these factors, we find it apparent that defendant's right to remain silent was scrupulously honored. Defendant turned herself in to the police at the restaurant because she knew she was wanted for the murder of Eliza Williams. At this time, she was not in custody. Then, Sergeant Tidmarsh advised her of her *Miranda* rights. At approximately the time Tidmarsh finished reading defendant her rights, the arresting officers arrived at the restaurant. She then stated she did not want to make a statement. Sergeant Tidmarsh told Investigator Banahan that when she declined to make a statement at the restaurant, she had mentioned "something about people around." The arresting officers told Banahan that after defendant had stated that she was wanted for the murder of Eliza Williams, she also remarked that she did not want to make any further statement there.

At Area Two Homicide, after Banahan spoke to the arresting officers and Sergeant Tidmarsh, he identified himself as an investigator to defendant, advised her of her *Miranda* rights, and explained them to her. She stated that she understood and then gave an oral statement incriminating herself in the killing of Eliza. Defendant appeared composed, and neither Tidmarsh nor Banahan noticed any indication that she had been drinking or was intoxicated before she talked to the police. After she gave the oral statement, Banahan asked her if she would give a written statement. She declined and requested a lawyer. Banahan asked her at least three more questions, the answers to which were not admitted into evidence. The trial court found that the admissibility of defendant's statements following her refusal to answer further questions turned on "the persistence of the questioning, perhaps the use of subterfuge." The court ruled that defendant readily answered the questions of Banahan and there appeared to be no coercive methods used.

The pending case fits well within the *Mosley* standards. After defendant first asserted her right to remain silent, there was a complete cessation of questioning for approximately one hour. Further, the reinterrogation was preceded by recitation of a complete set of *Miranda* warnings. Additionally, the reinterrogation was not performed by the same officer who conducted the previous interrogation. Although defendant was questioned about the same offense, this factor has not been deemed pivotal. (See *People v. Lakes* (1978), 60 Ill. App. 3d 271, 376 N.E.2d 730; *People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378.) Moreover, "[t]he fact that a defendant has exercised his right to remain silent by declining a request that he make a statement does not permanently preclude all future inquiries by officers to determine whether he has changed his mind. [Citations.]" *People v. Gibson* (1977), 55 Ill. App. 3d 929, 935, 371 N.E.2d 341, 345.

■■ In this case, both Sergeant Tidmarsh and Investigator Banahan ques-

tioned defendant. Banahan's interrogation occurred approximately one hour after defendant told Tidmarsh at the restaurant that she did not wish to make a statement. Thus, a significant passage of time between questioning occurred, enabling defendant to make an informed and intelligent assessment of her interests as envisioned by *Mosley.* (See *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321.) Furthermore, there is no evidence here that her incriminating statement was less than voluntary due to persistent and repeated efforts on the part of police officers to wear down her resistance and make her change her mind. (Compare *United States ex rel. Doss v. Bensinger* (7th Cir. 1972), 463 F.2d 576, *cert. denied* (1972), 409 U.S. 932, 34 L. Ed. 2d 186, 93 S. Ct. 239; *People v. Gibson* (1977), 55 Ill. App. 3d 929, 371 N.E.2d 341.) The motion to suppress defendant's post-arrest statements was properly denied.

## II

Defendant contends that the court erred in admitting testimony as to oral statements she made to Michael Williams because the prosecution did not disclose such statements on discovery. We disagree. Counsel for defendant had filed a motion for pretrial discovery requesting written or oral statements made by defendant as well as a list of witnesses to the statement.

■■ Supreme Court Rule 412(a)(ii) requires the prosecution, upon written motion of defense counsel, to disclose any written or recorded statements and the substance of any oral statements made by the accused. (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a)(ii).) The supreme court promulgated this rule to afford the accused protection against surprise, unfairness and inadequate preparation. (*People v. Shegog* (1976), 37 Ill. App. 3d 615, 346 N.E.2d 208; *People v. Boucher* (1978), 62 Ill. App. 3d 436, 379 N.E.2d 339.) Compliance with the rule is mandatory (*People v. Musgray* (1976), 37 Ill. App. 3d 48, 344 N.E.2d 708), but noncompliance with discovery requirements does not require reversal absent a showing of prejudice. (*People v. Steel* (1972), 52 Ill. 2d 442, 288 N.E.2d 355.) Moreover, the trial court has discretion in allowing introduction of testimony not disclosed where there is no showing of surprise or prejudice; further, a defendant cannot complain when he fails to request a continuance for investigation of the statement, and instead proceeds with trial. *People v. Callaham* (1978), 60 Ill. App. 3d 1020, 1027, 377 N.E.2d 171, 178.

■■ In the pending case, Michael Williams testified on direct examination without objection that on August 14 he received a telephone call from defendant in which she asked to speak to Eliza Williams. When he replied that she had been badly hurt, defendant stated that she would come over immediately. After this testimony, defense counsel requested and was granted a sidebar conference during which he pointed out that the prose-

cution had violated the discovery rules. He demanded a mistrial. The court denied the motion and defense counsel then requested that the prosecution be precluded from further use of the statement. This was denied. However, defense counsel did not make timely objection to the testimony, and failed to request a continuance but proceeded with the trial. Therefore, defendant has waived her objection for the purpose of review. (*People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227; *People v. Callaham* (1978), 60 Ill. App. 3d 1020, 1027, 377 N.E.2d 171, 178.) Furthermore, even assuming no waiver, the substance of the telephone conversation was not potentially exculpatory evidence (see, *e.g., People v. Nichols* (1976), 63 Ill. 2d 443, 349 N.E.2d 40), nor does the undisclosed statement contradict defendant's testimony (see, *e.g., People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117). Nor does it appear that the testimony about the telephone conversation surprised defendant inasmuch as she testified on cross-examination that she telephoned Eliza's brother and asked where Eliza was. Finally, the statement in no way refutes defendant's testimony that she acted in self-defense and thus did not prejudice her.

■■ Additionally, the plain error exception (73 Ill. 2d R. 615(a)) should not be applied here. Before plain error can be considered as a means of circumventing the general waiver rule, it must be plainly apparent from the record that an error affecting substantial rights was committed. (See *People v. Jackson* (1981), 84 Ill. 2d 350, 358-59, 418 N.E.2d 739, 743.) The evidence of guilt is overwhelming. Under no circumstances can we say that the verdict in this case would have been otherwise if the statement complained of had not been made.

### III

Defendant contends that the State failed to prove her guilty beyond a reasonable doubt because the evidence showed that she acted either in self-defense or the shooting was provoked either by "serious provocation" or committed with an unreasonable belief that deadly force was necessary to prevent imminent great bodily harm. Defendant urges that her conviction for murder be reversed or reduced to voluntary manslaughter. Again, we cannot agree.

Section 7—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 7—1) states, in pertinent part, as follows:

"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to

prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

In addition, if defendant is the aggressor, the use of deadly force is justified only if:

"(1) such force is so great that he reasonably believes that he is in imminent danger of death or great bodily harm, and that he has exhausted every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the assailant; or

(2) in good faith, he withdraws from physical contact with the assailant and indicates clearly to the assailant that he desires to withdraw and terminate the use of force, but the assailant continues or resumes the use of force." (Ill. Rev. Stat. 1977, ch. 38, pars. 7—4(c)(1) and 7—4(c)(2).)

Thus, whether defendant acted in self-defense was a question of fact to be determined by the jury, with the burden of proof upon the State. (*People v. Woods* (1980), 81 Ill. 2d 537, 410 N.E.2d 866; *People v. Price* (1979), 79 Ill. App. 3d 1112, 1117, 398 N.E.2d 1158.) It is the function of the triers of fact to determine the credibility of the witnesses and the weight to be given their testimony and to resolve conflicts in the testimony. (*People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.) The jurors could refuse to accept defendant's testimony if they found that she was not credible. Such a decision could have been based on defendant's testimony that she shot Eliza Williams in self-defense, which did not square with the physical evidence and other testimony which was inconsistent with her statements to the police. If the jury did not believe defendant, then her testimony standing alone would not raise a reasonable doubt of guilt. *People v. Lynch* (1976), 43 Ill. App. 3d 1039, 1042-43, 358 N.E.2d 17, 19.

Defendant testified in support of her theory of reasonable or unreasonable belief in the need for self-defense, but her defense depended on her credibility. Her assertion at trial was that she and Eliza argued; that Eliza drew a gun on her; that she moved toward the victim, a struggle ensued, the gun went off in the struggle and the gun dropped; that she grabbed the gun and shot Eliza twice; that Eliza sat on the edge of the bed and put her hands on her head; that defendant then threw the gun and walked out the back door; and that four days later she contacted Eliza's brother and then surrendered to the police.

This theory was refuted by the following evidence: (1) Defendant's prior statement to police, given after Investigator Banahan pointed out that her initial exculpatory account was inconsistent with Eliza's physical condition, in which defendant admitted that she knew that Eliza kept a gun under the mattress and that she grabbed the gun while Eliza was

putting rollers in her hair and shot her; (2) Eliza was unarmed when defendant shot her three times; (3) Eliza's brother and sister found her dead, lying on her bed face down on her left side and the house was neat and orderly; (4) the house was undisturbed and there was no sign of a struggle defendant stated occurred; (5) Eliza suffered three gunshot wounds and there was no blackening or speckling present on any of the wounds indicating that the shots were not fired at very close range, which is consistent with defendant's statement to Investigator Banahan that she shot Eliza from the head of the bed while Eliza was putting curlers in her hair at the foot of the bed; (6) the bullets all entered Eliza's body from front to back, which is inconsistent with defendant's testimony that Eliza was reaching toward her dresser at the foot of her bed when she was killed, because if she had been reaching toward her dresser when she was shot the gunshots would have entered from back to front; (7) defendant's testimony that she left Eliza sitting on her bed with her hands on her head is inconsistent with the circumstance that Eliza was found lying prone and face down on her bed; (8) despite evidence offered by defendant that Eliza had been violent four years before and also approximately six months before she killed her, defendant never demonstrated any fear of Eliza because of the violence and continued to live with her after both incidents; and (9) although motive is not a requirement defendant had a motive to kill Eliza in that she went to the apartment to tell Eliza she was moving out and said "she couldn't bear it anymore" and had been "used and manipulated" by the victim. Further, evidence of flight was competent circumstantial evidence that tended to refute her theory. (*People v. Price* (1979), 79 Ill. App. 3d 1112, 398 N.E.2d 1158.) The jury, presented with this conflicting evidence, rejected defendant's testimony that she justifiably acted in self-defense or that she had an unreasonable belief that her use of force was necessary. The murder conviction is supported by the evidence adduced at trial and the judgment should be affirmed.

Further, no instruction based on a theory of "provocation manslaughter" should have been submitted to the jury because the record discloses no credible evidence of struggle or serious provocation that triggered the killing. Defendant's reliance on *People v. Williams* (1965), 56 Ill. App. 2d 159, 205 N.E.2d 749, and *People v. Hudson* (1979), 71 Ill. App. 3d 504, 390 N.E.2d 5, is misplaced. Both cases are distinguishable on their facts. In *Williams*, the court found that defendant taxi-driver was justified in using deadly force in self-defense against the deceased who was a member of a youth gang that had threatened force. The deceased had thrown a cement block and brick which damaged the taxi, causing the defendant to fear for his life. In *Hudson*, defendant killed deceased with a kitchen knife he found near the sink during a fight in which deceased was prevailing. When the fight was over defendant waited for the police. Also,

there were witnesses to collaborate his story. By contrast, in the pending case, defendant's account of a struggle with Eliza was contradicted by the undisturbed condition of the apartment, the position of the wounds on Eliza's body, defendant's statement to Investigator Banahan, her knowledge of where Eliza kept her guns and her flight from the scene of the killing.

## IV

Approximately 10 months after defendant was convicted of murder and sentenced to a term of 20 years, defense counsel filed a petition seeking relief under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 72). The petition raises these issues: (1) whether the court erred in dismissing the petition without a hearing and not construing the petition filed under section 72 as one filed under the Post-Conviction Hearing Act; and (2) whether the petition presented a constitutional question.

The testimony adduced at petitioner's trial has herein been summarized. Only insofar as it is pertinent to the post-conviction appeal, will testimony again be summarized and supplemented.

At trial, defendant, in testifying as to her state of mind at the time she shot and killed Eliza Williams, testified to an incident concerning Eliza Williams' violent nature. She stated that several years ago she was sitting in her apartment when Eliza came in with blood splattered on her clothes. When she asked Eliza what had happened, Eliza answered, "I had to kill somebody." She also testified that Eliza may have said that her brother, Michael, was present at the shooting. At the time, she did not call the police. In rebuttal, Michael testified that he never saw his sister shoot anyone. During closing argument, the prosecution stressed that Eliza was a peaceful person. Additionally, at trial the evidence disclosed that defendant told police she killed Eliza while Eliza was putting rollers in her hair. Eliza suffered three gunshot wounds, there was no blackening or speckling on any of the wounds, and she was found dead on her bed. Furthermore, defendant and Eliza had been friends since high school and for ten years prior to Eliza's death had lived together. After Eliza told her she had killed someone, defendant continued to live with Eliza. Moreover, Eliza had never pulled a gun on defendant.

Defense counsel's affidavit filed in support of the section 72 petition stated that prior to trial defendant told her that Eliza had shot a man named "Abdullah" and that "Abdullah" hung out in a pool hall on the corner of 63d and Langley. Trial began on May 7, 1979. On March 21, defense counsel had gone to the pool hall and learned that "Abdullah" was Reginald Dunne. She left her business card at the pool hall for Dunne. Dunne called defense counsel on April 19, and she talked to him on April

20. He related the matters contained in his affidavit attached to the section 72 petition, alleging that Eliza had deliberately shot him with a pistol and that the shooting was motivated by the death of Eliza's brother, Rickey. Defense counsel was unable to contact Dunne during defendant's trial, but no request for a continuance was made in order to secure Dunne's presence at trial and no offer of proof was made concerning Dunne's testimony. The section 72 petition requested a new trial. After argument, the petition was denied.

In denying the petition, the court found that although defendant's testimony as to her knowledge of the shooting incident between Eliza and Dunne was admissible to show her intent and thus whether she acted in self-defense, Dunne's independent separate act testimony would not have been admissible. Further, the court ruled the proffered testimony to be of a cumulative nature.

The prosecution argues that newly discovered evidence may not be considered as grounds in support of a section 72 petition. (*People v. Hammers* (1977), 48 Ill. App. 3d 1023, 363 N.E.2d 914; *People v. Colletti* (1971), 48 Ill. 2d 135, 268 N.E.2d 397.) Defendant concedes this argument and agrees that relief in a criminal case on the basis of newly discovered evidence can only be obtained if the issue is raised in a motion for new trial filed within 30 days after conviction. (Ill. Rev. Stat. 1977, ch. 38, par. 116—1(b); *People v. Colletti.*) However, defendant posits that her "newly discovered" evidence raises a doubt of her guilt and in consequence raises a constitutional issue presentable in a post-conviction petition. She cites *People v. Slaughter* (1968), 39 Ill. 2d 278, 235 N.E.2d 566, and *People ex rel. Palmer v. Twomey* (1973), 53 Ill. 2d 479, 292 N.E.2d 379. In support of her position, maintaining that in the interests of justice her section 72 petition should have been construed as a petition under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1979, ch. 38, par. 122—1 *et seq.*). These cases, however, are inapposite to the case at bar. In *Slaughter* and *Twomey* inartfully drawn pro se petitions were treated as petitions under the Post-Conviction Hearing Act. By contrast, in the present case, the petition was filed by defendant's appointed trial counsel. Further, the evidence was not "newly discovered" since prior to trial defendant's attorney had learned "Abdullah's" name was Reginald Dunne, had contacted him and obtained the facts that are the basis for post-conviction relief. Moreover, even if defendant's petition was considered as one filed under the Post-Conviction Hearing Act, the standards of that act have not been met. Her contention of "newly discovered" evidence is not of constitutional dimension. (*People v. Hammers* (1977), 48 Ill. App. 3d 1023, 1027, 363 N.E.2d 914, 917.) Newly discovered evidence can only be raised in a motion for new trial filed within 30 days of conviction and not in section 72 or post-conviction petitions. There are two exceptions to this rule not

present in the pending case: (1) when the prosecution prevented defendant from discovering the evidence during trial; and (2) when the sole prosecution witness who could establish defendant's criminal participation recants his testimony. (*People v. Moore* (1975), 60 Ill. 2d 379, 384, 327 N.E.2d 324, 327; *People v. Bland* (1978), 67 Ill. App. 3d 716, 384 N.E.2d 1380, 1386; *People v. Hammers* (1977), 48 Ill. App. 3d 1023, 1028, 363 N.E.2d 914, 917; *People v. Oswalt* (1975), 26 Ill. App. 3d 224, 227, 324 N.E.2d 666.) Even if new evidence is considered in a post-conviction petition, defendant is not entitled to relief where there was other ample evidence which established defendant's guilt beyond a reasonable doubt. (*People v. Moore* (1975), 60 Ill. 2d 379, 386, 327 N.E.2d 324, 328.) The "new" evidence alleged in the petition in this case raised no constitutional question since consideration of the evidence would not have raised a doubt of defendant's guilt. Furthermore, the "new" evidence was merely cumulative because defendant had already testified concerning her knowledge of the incident.

■■ In addition, the prosecution maintains that the court properly found that the "new" evidence defendant sought to introduce would have been inadmissible. We agree that the court would have been correct in not admitting this evidence. Defendant in her petition sought to introduce testimony by Dunne concerning an act of violence by Eliza Williams to establish defendant's state of mind at the time she killed Eliza. Her knowledge of specific acts of violence by Eliza was admissible to show her state of mind (*People v. Gall* (1979), 79 Ill. App. 3d 823, 828, 398 N.E.2d 1118, 1121), and she testified to this shooting incident and another incident of violence concerning Eliza. However, since the question involved was defendant's state of mind, independent third-party testimony by Dunne about whether an event occurred several years before is remote and irrelevant and could be properly excluded. 15 Am. Jur. 2d Proof of Facts 183 (1978); *People v. Hill* (1968), 97 Ill. App. 2d 385, 240 N.E.2d 373.

Defendant's reliance on *Jackson v. Virginia* (1979), 443 U.S. 307, 316, 61 L. Ed. 2d 560, 571-72, 99 S. Ct. 2781, 2788, is not justified because it does not dictate a different result in this case. The *Jackson* court established the standard of review in Federal habeas corpus proceedings. The question in *Jackson* was whether defendant initially had been proved guilty beyond a reasonable doubt. The court held, after viewing the evidence in a light most favorable to the prosecution, that a rational factfinder could readily have found petitioner guilty of murder beyond a reasonable doubt under Virginia law. *Jackson* did not involve new evidence or the right of a defendant, who is afforded one review as to the sufficiency of the evidence, to reopen the case and redetermine guilt or innocence upon the alleged discovery of new evidence. In the present case, when the evidence is viewed in the light most favorable to the

prosecution, a rational trier of fact could have found defendant guilty of murder beyond a reasonable doubt. Likewise, *In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (which held that proof beyond a reasonable doubt standard is mandated by due process) gives no support to defendant's contention that she was deprived of a constitutional right and consequently is entitled to post-conviction relief. We have previously concluded that the prosecution's evidence established defendant's guilt of murder beyond a reasonable doubt.

We therefore hold that the trial court did not err in failing to treat the section 72 petition as a post-conviction petition because defendant's allegation of newly discovered evidence does not support a post-conviction petition, the evidence was not newly discovered, was cumulative, and raised no constitutional question. Accordingly, the judgment of the court dismissing the petition without an evidentiary hearing is affirmed.

In summary, for the aforementioned reasons, the judgments of the court in both the direct appeal, No. 79-1634, and in the appeal of the denial of the section 72 petition, No. 80-1061, are affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.