(No. 73610.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WESLEY ROBINSON, Appellant.

*Opinion filed October 21, 1993.—Rehearing denied November 29, 1993.*

BILANDIC, J., joined by HARRISON and McMORROW, JJ., dissenting.

Robert Agostinelli, Deputy Defender, and Kenneth D. Brown, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Bradley P. Halloran, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Wesley Robinson, was charged in a three-count indictment in the circuit court of Will

County with first degree murder and armed robbery. The defendant pleaded not guilty and was tried before a jury. Pursuant to the defendant's request, an instruction regarding the offense of misdemeanor theft was included. The defendant was found guilty of first degree murder, armed robbery and theft. The jury subsequently determined that the defendant was eligible for the death penalty, but declined to impose it. The defendant was then sentenced to a term of natural life imprisonment. The appellate court, with one justice dissenting, affirmed defendant's convictions, but remanded the cause to the trial court for further post-trial proceedings. (226 Ill. App. 3d 649.) We granted the defendant's petition for leave to appeal (134 Ill. 2d R. 315).

On appeal, defendant argues that the State violated discovery requirements by failing to reveal certain evidence until the second day of the trial and that he was denied a fair trial due to prosecutorial misconduct during closing arguments. Additionally, the State has cross-appealed urging us to reverse the appellate court's remand for further post-trial proceedings. We affirm the appellate court.

## Facts

On October 27, 1988, defendant was an inmate at Stateville Correctional Center. He was assigned to work in the dining room and was expected to report between 5 and 5:30 a.m. Testimony revealed, however, that defendant did not show up for work on this date. Gary Adams, an employee supervisor at Stateville, testified that on the morning of October 27, 1988, he saw the defendant in the area of the commissary and it appeared as if he was hiding something behind his back. Jessie and James White, two additional Stateville employees, testified that at about 6:40 a.m. on October 27, 1988, they were walking down the main tunnel toward the

commissary. As they approached the commissary, the Whites saw a cap belonging to Suon Troeng on the ground. Troeng, a Stateville employee, was assigned to open the commissary on that day. Next, Jessie White saw an inmate come down the tunnel and jump over one of the side walls. The Whites looked over the wall and saw an inmate crouched over in the corner of the grass. When they asked him what he was doing, the inmate, whom Jessie White later identified as the defendant, jumped over the wall and started running with a large plastic bag over his shoulder. James White ran after the defendant and called at two correctional officers for help. As the defendant was running, he dropped the plastic bag and a set of keys. The officers caught the defendant and recovered the bag and the keys. Inside the bag were loose cartons of cigarettes. While the defendant was being chased, Jessie White ran into the commissary for help. She noticed that the commissary was in disarray, with bags strewn around and open cigarette cartons on the floor. When Jessie White came back out of the commissary, she found Troeng's body. An iron bar was found near the body, and it was subsequently determined that Troeng died from a severe head injury due to blunt-force trauma.

Richard Williams testified that on October 27, 1988, he was the correctional sergeant in unit 1, a segregation unit separated from the general prison population. Following the defendant's apprehension, defendant was brought into unit 1 and strip searched by Williams. Among the items taken from the defendant were State-issued work boots and a blue jumpsuit. The jumpsuit had stains on the knee and thigh areas which appeared to be bloodstains.

A partial shoe impression was found on a paper sack on the floor of the commissary. Walter Sherk, an expert in footprint comparisons, testified that he compared the

footwear impression on the paper sack with the boots recovered from the defendant. He stated that while the boots recovered from the defendant were standard issue at the Department of Corrections, the impression was consistent with defendant's right boot. In looking for defendant's fingerprints at the scene, his prints were found on two separate plastic bags.

Judie Welch, an expert in forensic serology, testified that she compared blood samples of Troeng and the defendant with blood found on an iron bar found at the scene, a jumpsuit taken from the defendant, and a pair of pants taken from the defendant. Welch's conclusions were that the bloodstains found on the iron bar and the jumpsuit could have originated from Troeng, but not the defendant. The bloodstain on the pants, however, could have originated from the defendant, but not Troeng.

During the second day of trial, November 6, 1989, defense counsel orally moved to exclude the testimony of correctional officer Elton Lawler, or, in the alternative, for a mistrial on the basis that the State had violated discovery requirements. Defense counsel noted that he had just received, for the first time that morning, a copy of Lawler's report, which was dated October 24, 1989. Lawler's report indicated that he was the first person to search the defendant following his arrest and found, among other things, two pairs of gloves on the defendant and four or five "stingers." Stingers are heating elements for boiling water for coffee. The gloves were examined by the crime lab and found to have bloodstains on them consistent with those of Troeng's blood type.

Defense counsel argued to the trial court that the late disclosure of Lawler's report was unduly prejudicial because prior to the surfacing of this report, there was no evidence linking the defendant to the gloves. While defense counsel was aware that the gloves existed and knew the result of the blood test performed on the

gloves, there was no report linking the defendant to the gloves. Thus, defense counsel contended that prior to the surfacing of this report, the evidence would only show that the defendant was guilty of the theft of cigarettes from the commissary. Additionally, defense counsel pointed out that it was not until October 20, 1989, that he received a supplemental list of witnesses containing Lawler's name and the name of Yolanda Galvan, a correctional officer who allegedly received the gloves from Lawler. Upon receiving the supplemental list, defense counsel asked the prosecutor if he had a report from Lawler, but the prosecutor responded that he had not yet received a report from either Lawler or Galvan.

The prosecutor responded to defense counsel's objection by noting that he first learned on October 22 or 23, 1989, while reconstructing the chain of custody for the gloves, that Lawler found the gloves on the defendant. The prosecutor stated that contrary to defense counsel's assertions of not having prior notice of Lawler's report, the report was given to defense counsel on October 25 or 26, 1989, only a day or two after it was prepared. The trial court denied defendant's motion and Lawler was allowed to testify.

Lawler's testimony was consistent with the information contained in his report. Additionally, Lawler stated that immediately following his search of defendant, he turned over the stingers and the gloves to Yolanda Galvan. Lawler also claimed that he prepared a report of the incident and filed it with Galvan on October 27, 1988. Galvan testified that she received the gloves and two stingers from Lawler, but that he did not file a report.

At the close of the State's case in chief, the parties stipulated that the Stateville commissary was inventoried on October 31, 1988, and, taking into account all of the cigarettes which had been taken into custody, an ad-

ditional 242 packs of cigarettes remained unaccounted for following the break-in at the commissary. There was no evidence, however, as to any previous inventory of the commissary prior to that date.

In his own defense, the defendant testified that on October 27, 1988, he arrived at his work assignment at about 5 a.m. Nobody was in the dining room, so the defendant left to get some supplies and then returned. When the inmates and staff began to arrive for breakfast between 5 and 5:30 a.m., the defendant emptied a trash container and then decided to go to the laundry room to get some bleach. As he approached the laundry room, he saw correctional officer Gary Adams and two inmates in the food wagon, and he waved at them. Shortly thereafter, the defendant decided to follow Adams to the general store and assist him there. When the defendant got to the store, though, Adams and the inmates were already inside. The defendant banged on the door of the store and waited about 10 minutes until he saw a line of inmates on their way back from breakfast. When he saw this, he realized it was close to 7 a.m. and he had to report back to the dining room to be counted. On the way back, he passed the commissary and saw a hat, some keys, some stingers, and two or three large bags on the ground.

Next, the defendant claimed that he heard some groaning. He looked over the wall and saw Troeng lying on the ground. He climbed over the wall and lifted Troeng up to a sitting position. Some blood was coming from Troeng's mouth, but he did not appear to be seriously injured. The defendant did not want to be blamed for the incident, so he climbed back over the wall. The defendant recalled that, as he began to leave the area, he picked up two stingers, the keys, and one of the bags. He looked in the bag and saw that it contained a lot of cigarettes. He then heard someone coming so he hid on

the other side of the wall. He still had the cigarettes with him, but he never made a conscious decision to steal them. When somebody yelled at him, he ran toward the general store and, as he did so, he dropped the bag of cigarettes and the keys.

The defendant denied striking Troeng with an iron bar. He also testified that he did not have any gloves with him that day and that, after he was taken into custody, Lawler searched him but did not find any gloves.

## Disclosure of Lawler's Report

Defendant claims that he is entitled to a new trial due to the State's failure, until the second day of trial, to disclose that it had evidence linking the defendant to a pair of gloves which were stained with blood consistent with that of the victim. Defendant contends that this information was extremely prejudicial, because this was the first and only evidence linking the gloves to the defendant, and it had been the defendant's theory that the actual perpetrator of the crimes was the person who wore the gloves and who stole the 242 unaccounted for packs of cigarettes.

The murder of Suon Troeng occurred on October 27, 1988. The State furnished its original discovery list on December 2, 1988. Additional supplemental discovery lists were filed in April, August, September, and October 1989. Lawler, however, was not named as a witness on any of these lists. In preparation for trial, the State's Attorney's office reconstructed the chain of custody for the gloves. It was at this time that the State first became aware that Lawler was involved in the chain of custody, and that he was the correctional officer who found the gloves on the defendant. Upon learning that Lawler was involved, the State, on October 20, 1989, immediately disclosed his name to the defense. Since Lawler's original report was either lost or never filed, a

second report was prepared on October 24, 1989, and it was filed on the next day. There is some dispute over when defense counsel received the report. The prosecutor claimed that he gave the report to defense counsel on October 25 or 26, 1989. Defense counsel, however, claimed that he did not receive it until November 6, 1989, the second day of trial, and the same day that Lawler testified. The trial and appellate courts both resolved this factual question in favor of the State. Given that the trial court is in the best position to determine factual disputes, we see no reason to disturb this finding.

Prior to Lawler's testimony, defense counsel moved for either the testimony to be excluded or a mistrial. Both of these motions were denied by the trial court. Upon the denial of these motions, defense counsel failed to request a continuance and proceeded with the trial. Defendant claims that a continuance would not have been useful because a short break would not have allowed an adequate investigation into possible evidence refuting Lawler's claims that he found the gloves on the defendant.

While compliance with the discovery requirements is mandatory, the failure to comply with these requirements does not require a reversal absent a showing of surprise or undue prejudice. The burden of showing surprise or prejudice is upon the defendant, and the failure to request a continuance is a relevant factor to consider in determining whether the new testimony actually surprised or unduly prejudiced the defendant. (*People v. Steel* (1972), 52 Ill. 2d 442, 450; *People v. Ferguson* (1981), 102 Ill. App. 3d 702, 713.) Additionally, since a recess or continuance for the purpose of pursuing an investigation regarding the gloves would have met the problem of late disclosure in a less drastic way than a mistrial, it should have been requested. A defendant cannot request only the most drastic measures, such as ei-

ther an immediate mistrial or the total exclusion of testimony by a witness, and then on appeal argue that he is entitled to a new trial when these requests are not granted. A one- or two-day continuance may have allowed the defendant sufficient time to investigate the new evidence connecting him to the gloves. Even if this amount of time would not have been sufficient, by requesting a continuance, a record would have been established that a substantial amount of time was both needed and seen as important by the defendant. When the defendant failed to request a continuance and elected to proceed with the trial, the claimed error, if any, was waived.

Supreme Court Rule 412 provides for the disclosure of materials and information within the State's possession. (134 Ill. 2d R. 412.) Under Rule 412(f), the prosecution has the duty to ensure that a flow of information is maintained between various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused. The purpose of the discovery provision is to afford the accused protection against surprise, unfairness and inadequate preparation. Defendant contends that, under this rule, it is irrelevant that the prosecution did not learn of Lawler's involvement in the instant case until tracing the gloves' chain of custody on the eve of the trial. Defendant claims that Lawler's knowledge, as an officer for the Department of Corrections, is imputed to the State since investigative personnel must fully participate in providing evidence to the State's Attorney in order that discovery can be accomplished. Thus, according to the defendant, since the State possessed the imputed knowledge that Lawler found bloodstained gloves on the defendant, it was improper for this evidence not to have been disclosed until the second day of the trial.

If this court were to conclude that the knowledge of every State employee who is involved in a criminal case is imputed to the prosecution, the control over criminal cases would be placed in the hands, and at the mercy, of every employee who touches the case. While the knowledge of police officers under certain circumstances has been held to be imputed to the prosecution (*People v. Young* (1978), 59 Ill. App. 3d 254), we decline to extend this line of reasoning in a *per se* manner. Rather, we believe that the imputation of such knowledge to the prosecution requires an individualized focus on the factual circumstances. Among the factors to be considered would be the reasonableness of such imputation, whether the failure to transmit such knowledge up the informational chain was inadvertent or intentional and whether any real prejudice occurred. In the case at hand, it appears that the failure to transmit the information about the gloves by the correctional officer may have been inadvertent. At any rate, there is no indication that it was intentional. The prosecuting attorney promptly and expeditiously passed the information on to the defendant when it came to the prosecutor's attention. Moreover, the bloodstains on the gloves were cumulative to the bloodstains on the defendant's jumpsuit and on the iron bar.

Finally, while the evidence against the defendant was entirely circumstantial, the case against the defendant was overwhelming. A fair summation shows that defendant, in violation of his work assignment, failed to show up for work on the morning of the murder. Instead of being in the dining room as he was supposed to be, defendant was seen in the area of the commissary, and appeared to be hiding something behind his back. After the murder of Suon Troeng, an employee in the Stateville commissary, the defendant was seen hiding by the commissary, crouched behind a wall, near the body. Upon being spotted by correctional employees, defendant ran

from the scene with a bag containing cigarettes and a set of keys which had been taken from the commissary. During the relevant time period, the defendant was the only unescorted inmate who was seen around the commissary. Defendant's fingerprints were found on two plastic bags. A boot print found in the commissary was made by a standard boot issued to inmates at the Department of Corrections and had the same pattern and size as the defendant's boot. In addition to the bloodstains which were on the gloves, bloodstains were also on an iron bar found at the murder scene, defendant's jumpsuit, and defendant's pants. The bloodstain on the iron bar and defendant's jumpsuit was consistent with the victim's blood type. The bloodstain found on the pants was consistent with defendant's blood type.

Contrary to defendant's assertions, the evidence connecting the gloves to him was not the linchpin in the State's case. Defendant testified that upon seeing Troeng lying on the ground he lifted him up in a sitting position. Additionally, defendant admitted that some blood was trickling from Troeng's mouth. While defendant denied having a pair of gloves, the bloodstains on these gloves were neither more nor less incriminating than the bloodstains on his jumpsuit. Based upon this evidence alone, the jury could have determined that the bloodstains came to be on the gloves and the jumpsuit either from the defendant's attempt to help Troeng or from his attack upon Troeng.

Among the factors which this court considers in determining whether a defendant is entitled to a new trial stemming from a discovery violation by the State are the closeness of the evidence, the strength of the undisclosed evidence, the likelihood that prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose the new evidence. (*People v. Weaver* (1982), 92 Ill. 2d 545, 560.) As

we have previously noted, the evidence in this case over-whelmingly favored the State, and the evidence connect-ing the gloves to the defendant was cumulative and was not critical to the State's case. Moreover, as already noted, the alleged error was waived when the defendant did not request a continuance and elected to proceed with the trial.

### Improper Closing Argument

The defendant next contends that statements in the prosecutor's closing arguments were improper and de-prived him of a fair trial. First, the defendant claims that in response to his theory that the real murderer was responsible for the missing 242 packs of cigarettes from the commissary, the prosecutor misstated the evi-dence. Specifically, the defendant takes exception to the following statement made by the prosecutor.

"And what does the defense say to convince you that that's what happened [that the murder was actually com-mitted by the person who stole the missing cigarettes]? That there are not 25 cartons, 246 packages [*sic*] of ciga-rettes missing in an inventory of the commissary. Well, I don't know if any of you have ever worked in retail or wholesale, but it would certainly be an amazing fact if businesses could conduct inventories and come up not missing items. There isn't a business or retail outlet or any type of store in the entire country that would do an inventory and not find some shrinkage, and this store is located in the middle of a penitentiary, which is full of murderers, robbers, and thieves, and the inmates some-times come to work in there."

Defendant argues that, in reality, only employees work in the commissary and there was no evidence presented before the jury that inmates were allowed into the com-missary. In examining the closing arguments, the prose-cutor's statement regarding inmates' access to the com-missary was a single isolated remark. Following this

remark, the trial judge told the jury that it should remember the evidence. In order to preserve this type of issue for appeal, the defendant must both contemporaneously object and present the issue in a timely post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Since defendant failed to raise this issue in his post-trial motion, it has been waived.

Next, the defendant alleges that the prosecutor misstated the blood-comparison and boot-impression testimony of the State's expert witnesses. Specifically, the defendant objects to the following statements the prosecutor made during closing arguments:

> "And then you get down to the testimony of Judy Welsh [*sic*]. And she was the expert from the crime lab in the area of bloods. And what she gave us, ladies and gentleman, is she confirmed that, yes, this was the murder weapon [referring to the iron bar]. Because the victim's blood was found on this. Victim died of blunt trauma and his blood was on that, that's the murder weapon.
>
> After Judy Welsh [*sic*] testifies, what we've got is not only is Robinson at the scene of the crime, not only is he in possession of the cigarettes that were stolen from the commissary, not only is he in possession of the keys that it took to get inside of the commissary, not only is his boot impression found inside of the commissary, but what we've got is his blood, we've got the victim's blood all over Wesley Robinson. And I submit to you, ladies and gentlemen, that if any of us were standing here with somebody else's blood on our clothes and blood on the gloves, that's having blood all over you. That's somebody else's blood all over you. That's the State's case."

Defendant argues that these misstatements regarding the victim's blood and the boot impression deprived him of his right to a fair jury trial and constitute reversible error. In support of this theory, defendant relies upon *People v. Linscott* (1991), 142 Ill. 2d 22, and *People v. Giangrande* (1981), 101 Ill. App. 3d 397. While defend-

ant failed to raise objections to these comments during trial, we find that the prosecutor overstated the evidence and review under plain error. *People v. Sutherland* (1992), 155 Ill. 2d 1, 22.

While we are of the opinion that the prosecutor improperly stated that the victim's blood was found on the defendant, and that the defendant's boot impression was found in the commissary, misconduct during closing argument warrants reversal and a new trial only if the improper remarks resulted in substantial prejudice to the defendant. In other words, the comments must have constituted a material factor in the conviction. *Sutherland*, 155 Ill. 2d at 25.

Similarly to *Sutherland*, we do not find the remarks in the present case to have substantially prejudiced the defendant. Just prior to the comments relied upon by the defendant, the prosecutor stated:

> "The important thing about what Walter Sherk said [the State's expert in footprint comparisons] is the boot [imprint] is consistent with the boots that Wesley is wearing. But the most important thing Walter Sherk said is they're the same size boots as Wesley. So what we're saying is that Wesley is not eliminated by the boot impression."

This correct statement regarding the relevance of the boot impression effectively alleviated any harm which was done by the isolated boot-imprint statement to which the defendant refers.

Defense counsel addressed the blood-comparison evidence during his closing argument. He stated:

> "We still have some incriminating evidence. We have the possible blood of Mr. Suon Troeung [*sic*] on his coveralls. Again, we got to remember, first of all, that the blood is never positively identified. It can only be identified as not coming from Mr. Robinson and possibly having come from Mr. Suon Troeung [*sic*]. But let's even assume that it is the blood of Mr. Suon Troeung [*sic*]. My

client has explained what happened. He heard the moaning. He went over, he picked him up, he laid him against the side of the grate, propped him up a little."

The prosecutor, during rebuttal closing argument, also addressed the blood-comparison evidence. He stated to the jury that the blood found on the defendant's jumpsuit could have come from the victim. Also during rebuttal closing arguments, the prosecutor stated that the defendant was caught with bloodstains on him that could have come from the victim. In addition to these corrections, both attorneys and the trial judge instructed the jury that closing arguments were not evidence and that any statement made during closing arguments which was not based upon the evidence should be disregarded. In fact, defense counsel stated:

"Now, Mr. De Boer [one of the two prosecutors] has gone over the evidence, and I'm sure he stated it to you as he recalled it. I believe he made a couple of small misstatements, but I'm sure that they were innocent. I may be guilty of the same thing. Just remember what we say is not the evidence."

Based upon these corrections and the instructions which were given to the jury, taken together with the overwhelming volume of circumstantial evidence against the defendant, the prosecutor's remarks pale into insignificance. The defendant was not denied a fair trial and we will not disturb the conviction.

### Appellate Court's Remand for Further Post-Trial Proceedings

The State has cross-appealed urging us to reverse the appellate court's remand of the cause to the trial court for a further post-trial hearing. Prior to sentencing, the defendant filed a *pro se* post-trial motion in which he raised the issue of ineffective assistance of counsel. During post-trial proceedings, the trial judge denied defend-

ant's motion without making a preliminary inquiry into his claims. Additionally, the trial judge refused to allow the defendant to specify his complaints and to present supporting evidence and documentation.

While a *pro se* motion for a new trial alleging ineffective assistance of counsel does not *per se* require appointment of new counsel to assist in the motion, the trial court must at least examine the factual matters underlying the defendant's claim. If after examining the factual matters, the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then new counsel does not need to be appointed and the *pro se* motion can be denied. If, however, the allegations show possible neglect of the case, new counsel should be appointed. (*People v. Williams* (1991), 147 Ill. 2d 173, 251.) In the present case, the trial judge never reached the point of determining whether new counsel was necessary because he denied defendant's motion without any inquiry at all. While defendant's claims may be without merit, the trial court should have afforded the defendant the opportunity to specify and support his complaints. In short, the defendant's motion was precipitously and prematurely denied.

Accordingly, we affirm the appellate court, which affirmed the convictions and remanded the cause to the trial court for further post-trial proceedings.

*Affirmed.*

JUSTICE BILANDIC, dissenting:

On either the eve of trial or the second day of trial, depending upon which version of events one believes, the State disclosed to the defense that it possessed and intended to use Lawler's testimony. This testimony was crucial evidence which directly linked the defendant and the bloodstained gloves. Caught by surprise by the State's late disclosure, defense counsel moved either

for a mistrial or for the exclusion of this testimony. Defense counsel, however, did not move for a continuance. The majority holds that, even though defendant moved for a mistrial or to exclude Lawler's testimony, the defendant has waived his challenge to the State's discovery violation because he failed to move for a continuance. I cannot agree with the majority's conclusion that defendant has waived the discovery error. Nor can I agree that the defendant suffered no surprise or prejudice because of the State's discovery violation. For these reasons, I respectfully dissent.

The majority's determination that defendant has waived the discovery error is wrong. The majority opinion holds that, in order to preserve this issue for appeal, the defendant must move for a *continuance* at the trial level. Although "the failure to request a continuance is a relevant *factor*" in determining surprise or prejudice, it is no more than a factor. In certain instances such as the case before us, a continuance would not suffice to cure the surprise or prejudice resulting from the State's discovery violation and would amount to a futile request. Defendants certainly are not required to request all the remedies enumerated in Supreme Court Rule 415, especially remedies that counsel deems to be fruitless, in order to preserve the issue for review. The majority cites no support for its ruling that the instant defendant has waived this issue by failing to request a continuance. As a matter of fact, this court has already determined that defense counsel's refusal to *accept* a trial court's offer of a continuance is not necessarily fatal to the defendant's position. (See *People v. Weaver* (1982), 92 Ill. 2d 545, 559-60.) In the case at bar, defendant adequately preserved the discovery violation issue for appeal by moving to exclude Lawler's testimony or for a mistrial.

The majority correctly notes that, under Supreme Court Rule 412, upon motion of defense counsel, the State is *required* to disclose all witnesses it intends to call as well as their respective statements which it has in its possession. (134 Ill. 2d R. 412(a).) As the majority also notes, the State has a duty to "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged." (134 Ill. 2d R. 412(f).) The State's duty to disclose is a continuing duty and the fact that it did not learn of Lawler's statement until just prior to or during trial does not negate its duty. (*People v. Weaver* (1982), 92 Ill. 2d 545, 558.) Failure to disclose the statement is a violation of the discovery provisions whether or not the State's neglect was inadvertent or wilful. *Weaver*, 92 Ill. 2d at 558.

Supreme Court Rule 412 is designed and intended to protect the defendant from surprise, unfairness, and/or inadequate preparation and to afford the defendant an opportunity to combat false testimony. The State's failure to disclose material evidence, reports, or statements until just prior to or *during* trial can jeopardize a defendant's trial strategy and violate his due process guarantee of a fair trial. In its analysis of this issue, however, the majority improperly focused on whether the knowledge that evidence existed which linked the gloves to the defendant should be imputed to the prosecution. Rather, in cases where the State has violated discovery provisions, the real issue a reviewing court must address is whether the discovery violation unfairly prejudiced the defendant and whether the trial court failed to eliminate the prejudice. *Weaver*, 92 Ill. 2d at 559.

In considering the issue of prejudice, it must be noted that this is a capital case and that all of the State's evidence against the defendant is circumstantial. The defense theory of the case was that someone else had committed the crime of murder and that defendant came upon the murder victim *after* the crime had been committed. The defense knew that the bloodstained gloves existed but also relied on the fact that the State had no evidence linking these gloves to the defendant. This absence of evidence linking the gloves to the defendant was a crucial factor in support of the defense theory that someone else (*i.e.*, the glove owner) had caused the harm to the victim. The apparent absence of evidence created the possibility that there was someone else involved in the crime. Clearly, springing the evidence at issue upon the defendant just prior to or during the course of the trial constitutes surprise and unduly prejudiced the defendant's entire trial strategy. Had defense counsel been appraised of the fact that this evidence existed, he might have decided that the defense he had originally prepared was no longer viable. Since the trial court failed to eliminate the undue prejudice which the State's discovery violation caused to the defendant, a new trial is required.

For these reasons, I respectfully dissent.

JUSTICES HARRISON and McMORROW join in this dissent.