(No. 70126.— 

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CECIL SUTHERLAND, Appellant.

*Opinion filed December 4, 1992.—Rehearing denied March 29, 1993.*

CLARK, J., joined by FREEMAN, J., dissenting.

Charles M. Schiedel, Deputy Defender, of Springfield, and Charles W. Hoffman, Assistant Appellate Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M.

Madsen and Michael M. Glick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

The defendant, Cecil Sutherland, was indicted in Jefferson County for aggravated kidnapping, aggravated criminal sexual assault, and three counts of murder. After a change of venue from Jefferson County to Richland County, a jury convicted him of all charges. The same jury found him eligible for the death penalty based on the felony murder aggravating factor, and he subsequently was sentenced to death. Defendant took a direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1985, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603.

## FACTS

At 9 a.m. on July 2, 1987, an oil field worker discovered the nude body of 10-year-old Amy Schultz of Kell, Illinois, approximately 100 feet from an oil lease access road in rural Jefferson County. Amy's body was lying on its stomach covered with dirt. There were shoeprints on her back and several hairs were found stuck in her rectal area. In addition, a large open wound on the right side of Amy's neck exposed her spinal cord area. A pool of blood around Amy's head indicated that the murderer had killed her where she lay.

Amy Schultz's clothes—her shirt, shorts, underpants, shoes and socks—were found strewn along the oil lease road. Within 17 feet from the body, automobile tire impressions were found. Near the tire impressions, a shoeprint impression similar in design to the shoeprint on the body was found. Plaster casts of the tire and shoeprint impressions were made.

Dr. Steven Neurenberger performed an autopsy on July 3, 1987. He noted a 14.5 centimeter wound that ran

from the middle of the throat to behind the right ear lobe which cut through the neck muscles, severed the carotid artery and jugular vein, and cut into the cartilage between the neck and vertebrae. Amy's right eye was hemorrhaged and there was a small abrasion near her left eyebrow. Her ear was torn off the skin at the base of the ear and both her lips were lacerated from being compressed against the underlying teeth. There were also linear abrasions to the outer lips of the vagina which indicated that force had been applied to the back, pressing the vagina against the ground.

Dr. Neurenberger's examination for internal injuries uncovered three hemorrhages inside the skull, a fractured rib, and a torn liver. There was also evidence of tearing of the rectal mucosa. Finally, he found that Amy's vocal cords were hemorrhaged and her esophagus was bruised.

From the foregoing, Dr. Neurenberger deduced that the offender strangled Amy to unconsciousness or death, anally penetrated her, slit her throat, and stepped on her body to force exsanguination. Based on the gastric contents of her stomach, Dr. Neurenberger placed the time of death between 9:30 and 11 p.m. on July 1, 1987.

## THE EVIDENCE

Illinois State Police forensic scientist David Brundage examined the plaster casts of the tire print impressions made at the scene of the crime. He concluded, and testified at trial, that the tire impressions left at the scene were consistent in all class characteristics with only two models of tires manufactured in North America, the Cooper "Falls Persuader," and the Cooper "Dean Polaris."

Several months after the discovery of Amy's body, the police at Glacier National Park in Montana called Jefferson County Deputy Sheriff Michael Anthis regard-

ing Cecil Sutherland's abandoned car, a 1977 Plymouth Fury. At the time of Amy's murder, Sutherland had been living in Dix, Illinois, in Jefferson County, on the county line between Dix and Kell. Deputy Anthis determined that the car in question had a Cooper "Falls Persuader" tire on the right front wheel. Deputy Anthis and David Brundage then travelled to Montana where they made an ink impression of the right front wheel of Sutherland's car.

After comparing the plaster casts of the tire impression at the scene with the inked impression of the tire from Sutherland's car, Brundage concluded that the tire impression at the scene corresponded with Sutherland's tire and could have been made by that tire. Brundage, however, could not positively exclude all other tires due to the lack of comparative individual characteristics, such as nicks, cuts, or gouges.

Similarly, Mark Thomas, the manager of mold operations at the Cooper Tire Company, concluded that due to the "mal" wear similarity, Sutherland's tire could have made the impression found at the crime scene. Thomas compared the blueprints of Cooper tires with the plaster casts of the tire impressions and concluded that the "probability" was "pretty great" that a size P2175/B15 tire—the same size as Sutherland's Falls Persuader tire—had made the impression. He conceded, however, that there was a significant number of such tires on the road.

Forensic scientist Kenneth Knight compared the two pubic hairs recovered from Amy Schultz's rectal area with Sutherland's pubic hair as well as with pubic hairs from members of Amy's family and those from 24 suspected offenders in the case. Knight concluded that the pubic hairs found on Amy did not originate from her family or the 24 suspects, but "could have originated" from Sutherland.

Knight also examined the approximately 34 dog hairs found on Amy's clothing. He concluded that the hairs were consistent with and could have originated from Sutherland's black labrador, Babe. He further found that the dog hairs on Amy's clothes were dissimilar from her family's three dogs, her grandparents' dog, and three neighbors' dogs.

Tina Sutherland, Sutherland's sister-in-law, testified that Sutherland often carried Babe in his car and that it was impossible to be in defendant's car without getting covered with dog hair. Numerous dog hairs found in Sutherland's car were found to be consistent with the hairs from Babe.

Knight also examined Amy's clothing for the presence of foreign fibers. He found a total of 29 gold fibers in Amy's socks, shoes, underwear, shorts, and shirt. Knight concluded that all but one of the gold fibers found on Amy's clothes "could have originated" from defendant's auto carpet, but could not state that the fibers originated from Sutherland's auto carpet to the exclusion of all other auto carpets. He determined that the one remaining gold fiber found on Amy's clothes could have originated from the upholstery of Sutherland's car.

Knight also compared 12 cotton and 4 polyester fibers found on the front passenger side floor of defendant's car with cotton and polyester fibers from Amy's shirt. He found that the fibers from the car displayed the same size, shape, and color of the fibers from the shirt and concluded that they could have originated from the shirt. Furthermore, he also compared three polyester fibers found on the front passenger seat and floor of defendant's car with the fibers from Amy's shorts. Knight found these fibers consistent in diameter, color, shape, and optical properties and opined that the fibers from the car could have originated from the shorts.

The forensic expert for the defense, Richard Bisbing, agreed with the State's expert's conclusions on all the comparison evidence except as to the cotton fibers found in defendant's car. Bisbing did not agree that the cotton fibers were consistent, as he noticed some differences in size and color.

Amy Schultz had last been seen alive at approximately 9:10 in the evening of July 1, 1987. She was walking alone on Jefferson Street near 4th Street in the town of Kell, Illinois, in Marion County.

Tina Sutherland, defendant's sister-in-law, testified that on the evening of July 1, 1987, defendant was visiting his brother and her at their home in Texico, Illinois, in Jefferson County. Defendant often visited as he was living with his mother in Dix, Illinois, only five minutes away. Tina Sutherland testified that on the night of Amy's murder, defendant left her home at approximately 8 to 8:30.

Defendant's mother, Joan Sutherland, testified that he telephoned her at 10:57 p.m. from Harper's gas station in Mt. Vernon, Illinois. Mrs. Sutherland testified that defendant called because his car had broken down and he needed a ride to obtain a part for the car. The attendant at the gas station testified that defendant had been at the station approximately 20 to 30 minutes before he made the telephone call.

Tina Sutherland testified that from her house to Kell was a six- to seven-minute drive. Deputy Sheriff Anthis testified that the distance from Kell to the crime site was 12.1 miles and took 14 minutes to drive. He also testified that the distance from where the body was found to Harper's gas station in Mt. Vernon was 20.4 miles and took 22 minutes to drive.

The jury found defendant guilty of aggravated kidnapping, aggravated criminal sexual assault, and three counts of murder. The trial court denied post-trial mo-

tions and the case proceeded to a capital sentencing hearing. The jury found defendant eligible for the death penalty under the felony murder aggravating factor, and subsequently returned a verdict of death.

## ISSUES ON APPEAL

On appeal, defendant raises three categories of issues for review: (1) whether any trial errors require reversal of defendant's conviction; (2) whether any errors at sentencing require vacation of defendant's death sentence; and (3) whether the death penalty is constitutional. We find no merit to defendant's alleged errors and affirm the defendant's conviction and death sentence.

## TRIAL ERRORS

### Reconsideration of Change of Venue

Defendant first argues that the trial court deprived him of his right to due process and a fair trial under the sixth and fourteenth amendments when the trial judge reconsidered a transfer of venue. Defendant alleges that this reconsideration was the result of improper pressure from the chief judge of the circuit.

In June 1988, defendant was indicted in Jefferson County for the murder, kidnapping, and sexual assault of Amy Schultz. In December of that year, the defense moved to change venue to a location outside of southern Illinois alleging that he would not be able to obtain a fair trial in Jefferson County or any other southern Illinois county whose residents had been exposed to local media reports. In chambers on January 6, 1989, prior to the hearing on the motion, the trial judge informed the parties that if he were to grant the change of venue, he proposed to go to Springfield, Illinois, located in Sangamon County. He advised the parties, however, to keep the information confidential for fear of increased publicity in

that county. At the hearing in open court, the trial judge held that the defense had met its burden in establishing the necessity of the change of venue and ordered the venue to be changed to a different location, but did not state where.

On February 22, 1989, the trial court notified the parties that it had reconsidered the *in camera* decision to move the trial to Sangamon County. The judge stated:

> "The Chief Judge just dropped in a while ago to see me and suggested that we protect ourselves as to the County Board or adverse publicity and so on. That we— and also that we need the facts to support a change of venue out of our circuit to say another county. That I get figures as to the cost of housing the prisoner in, say, jail within our circuit or jail outside our circuit and also same as to Clerk fees and jurors' fees and so on. *** So I plan to call a county in this circuit that some way is far from here. Not too close or not too far away and get some figures and then tomorrow get more figures from different location [*sic*] and compare those."

Defense counsel objected to the announced reconsideration claiming that every county in the same judicial circuit as Jefferson County had been exposed to the same media reports as Jefferson County. Over defense counsel's objections, the trial judge ordered that venue be transferred to Richland County—a county within the same judicial district as Jefferson County.

Prior to commencement of trial, the defense renewed its objection to transferring venue to a county within the same judicial district, arguing that the chief judge had improperly interfered in the trial court's exercise of its judicial discretion. In response, the trial judge stated that he had investigated the possibility of transferring to Sangamon County but that the chief judge there told him that their facilities and workload made it impossible for them to accommodate the trial there. The court further stated that it had also contacted Champaign County

but found the cost of transferring venue there to be "somewhat prohibitive." The court concluded that "[i]f we can select a jury there that's fair and impartial, I don't see any point of going any further away from there, really."

On appeal, defendant argues that the trial court's reconsideration of the change of venue and subsequent transfer to a county located within southern Illinois deprived defendant of his rights to due process of law and to a fair and impartial jury. We find no merit to defendant's claim.

A defendant is entitled to a change of venue if it can be shown that "there are reasonable grounds to believe that the prejudice alleged actually exists and that by reason of the prejudice there is reasonable apprehension that the accused cannot receive a fair *** trial." (*People v. Gendron* (1968), 41 Ill. 2d 351, 354.) It is well settled that the granting of a change of venue "rests in the sound discretion of the trial court." (*People v. Allen* (1952), 413 Ill. 69, 73-74.) The trial court's discretion is subject to review only for its abuse. Such abuse may arise from a decision based upon whim or caprice, bad motive, or an unjust exercise of discretion under the circumstances. *Allen*, 413 Ill. at 74.

Defendant does not contend that the trial court's change in its order resulted in an abuse of discretion in and of itself. Rather, defendant alleges that the trial court's change of heart resulted from improper intervention by the chief judge of the Second Judicial Circuit, and that succumbing to such influences constituted an abuse of discretion requiring a reversal and a new trial.

We do not agree with defendant's contentions. Under the Illinois Constitution, the chief judge in each circuit has general administrative authority over his court, subject only to the authority of this court. (Ill. Const. 1970, art. I, §9.) We cannot say that the actions of the chief

judge in this case were beyond the purview of his administrative authority. From the record, it appears that the chief judge merely suggested to the trial judge that he reevaluate his initial proposal for change of venue and to take into consideration potentially unnecessary costs and any possible adverse publicity reflecting upon the judicial process.

We further note that the chief judge of the Second Judicial Circuit did not preempt the trial judge's discretion as defendant contends. On the record, the trial judge stated that "the Chief Judge did come *** and suggest that we take the trial to Olney and suggested that if we could not get a jury selected there we'll go some place else." We find no fault in these suggestions. We are not prepared to hold that a trial court abdicates its discretion anytime it considers a suggestion in changing venue.

Next, defendant alleges that transfer of the case to Richland County—a community 75 miles from the scene of the murder—was equivalent to no change of venue at all. Defendant argues that the pervasive media coverage caused the people of Richland County to go through the same emotional experience of Amy Schultz's murder as had the people of Jefferson County, and that this pretrial prejudice deprived defendant of the opportunity for a fair and impartial trial by jury.

In support of his contention, defendant points to the fact that of the veniremen who were asked, 92% stated that they had read or heard about the case. Defendant also notes that some 34% of those veniremen who were aware of the case testified that they believed the defendant was guilty, and that they could not put aside their opinion to decide the case fairly.

Exposure to a case, however, is not enough to demonstrate prejudice. Jurors need not be totally ignorant of the facts and issues involved. (*Irwin v. Dowd* (1960), 366

U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) Further, it is untenable to think that in our society—one that expects and relies upon the immediate transfer of information—that any qualified juror would have remained oblivious to events of local or international interest, and have failed to have some impression or opinion regarding it. What is essential is the juror's ability to lay aside impressions or opinions and render a verdict based upon the evidence presented in court. (*People v. Gendron* (1968), 41 Ill. 2d 351.) In this case, the 12 jurors selected for the case stated that they had formed no opinion based on what they had heard or read previously, and that they could decide the case solely on the evidence presented in court.

With regard to defendant's contention that a juror's good faith cannot counter the effect of exposure to prejudicial extrajudicial pretrial information (*People v. Taylor* (1984), 101 Ill. 2d 377), we find no evidence in the record that would suggest that the defense had trouble selecting an impartial and unbiased jury. Despite the fact that 10 of the final 12 jurors selected had heard about the case, their knowledge was minimal, general, and gleaned only from the local papers. In fact, the jurors answered in *voir dire* that they knew few details regarding the defendant and the victim until Judge Krause informed them of the nature of the case. More importantly, none had any recollection of information that would be prejudicial to the defendant. Therefore, we hold that the transfer to Richland County sufficiently protected the defendant's rights.

## Sufficiency of the Evidence

Defendant next contends that the State's circumstantial forensic evidence of hair, fiber, and tire print comparisons was insufficient to prove his guilt beyond a reasonable doubt. The defendant argues that the probative value of the State's forensic evidence lies merely in es-

tablishing that defendant could not be excluded as the possible offender, not that he must be the offender.

When faced with a challenge to the sufficiency of the evidence, the relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261; see also *People v. Pintos* (1989), 133 Ill. 2d 286; *People v. Campbell* (1992), 146 Ill. 2d 363.) The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. (*Pintos,* 133 Ill. 2d at 291; see also *People v. Eyler* (1989), 133 Ill. 2d 173, 191.) This standard of review does not allow the appellate court to "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation]." (*Campbell,* 146 Ill. 2d at 375.) Therefore, this court will not reverse a criminal conviction unless the evidence is so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation]." *Campbell,* 146 Ill. 2d at 375.

The evidence in this case, when viewed in the light most favorable to the prosecution, establishes that the two Caucasian pubic hairs removed from Amy Schultz's rectum were consistent in all respects with those from the defendant, but dissimilar from those of her family members and 24 other suspects in this case.

The evidence also established that the gold fibers found in Amy Schultz's socks, shoes, underpants, shorts, and shirt were consistent in all respects with the carpeting in the defendant's vehicle, but dissimilar to the carpet samples from Amy's environment. In addition, the evidence showed that a foreign fiber found in the victim's shirt was consistent with the seat fibers from defendant's vehicle in every respect, but it was dissimi-

lar to the sample fibers submitted from Amy's environment. Other fiber-comparison evidence demonstrated that fibers found on the front passenger side of defendant's vehicle were consistent with the fibers from Amy Schultz's shirt and shorts.

The prosecution further demonstrated that the dog hairs found in Amy Schultz's socks, shoes, shorts, and shirt were consistent with the dog hair standard submitted from defendant's dog in all characteristics; and, that the defendant's dog's hair was ubiquitous in the defendant's vehicle.

Furthermore, the State established that a tire on defendant's vehicle could have made the tire impressions found in the immediate vicinity of the victim's body.

Finally, the State's evidence demonstrated that defendant lived only minutes away from where Amy Schultz was last seen alive and that he had ample time between the time he left his brother's house until he was next seen at Harper's gas station to commit the crime.

Given the overwhelming and overlapping nature of the circumstantial evidence in this case, we are not prepared to say that the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. We find that a rational trier of fact could have inferred from the totality of the evidence that defendant kidnapped, sexually assaulted, and murdered 10-year-old Amy Schultz, and that he was guilty of these crimes beyond a reasonable doubt.

## The Knives

Defendant next contends that the introduction of a number of knives found in his possession at the time of arrest deprived him of a fair trial.

At the time of defendant's indictment in connection with Amy Schultz's death, he was serving a 15-year sentence in the Federal penal system after pleading guilty

to randomly sniping at employees of the National Park Service at Glacier National Park, in Montana. Prior to the instant trial, the defense moved to exclude from evidence a number of knives seized from defendant's possession at the time of his arrest in Glacier National Park. The trial court denied the motion stating that the knives had "some slight probative value" and would not prejudice the defendant by their introduction into evidence.

On appeal, defendant argues that the introduction of these knives resulted in substantial prejudice to defendant that outweighed any probative value. Defendant argues that the knives in this case had little or no probative value because the evidence indicated that the wound was not particularly distinctive and could have been caused by any sharp instrument with any length blade. Defendant also asserts that the knives were not probative in showing propensity and facility in the use of knives as there was no evidence that the killer possessed any special familiarity with knives.

Defendant further contends that, contrary to the trial court's finding, the knives were extremely prejudicial as one was a bayonet knife while another was a long knife with a jagged edge. Defendant alleges that the introduction of these knives into evidence, along with five others, portrayed him as a dangerous individual and that the jurors may have been overpersuaded and convicted him on that basis rather than on the facts relating to the offense for which he is being tried. We do not agree with defendant.

At the trial court's discretion, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. (*People v. Eyler* (1989), 133 Ill. 2d 173, 218.) In this context, prejudice means "an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, ha-

tred, contempt, or horror." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §403.1, at 168 (5th ed. 1990).) A reviewing court will not disturb a trial court's determination absent an abuse of discretion. *People v. Shum* (1988), 117 Ill. 2d 317, 353.

In this case, the victim suffered a wound approximately 14.22 centimeters in length. It is not unreasonable to think that such a wound could have been caused by a large sharp knife such as the ones in defendant's possession. Also, the choice of method of execution tends to indicate an affinity for such a weapon. Thus, the trial court found the knives probative of defendant's propensity towards possession and use of knives and determined that it was not so prejudicial as to warrant their exclusion. We agree with the trial court determination and hold that it did not abuse its discretion.

### The Tire Evidence

The defendant further contends that the State's evidence establishing that the tire impressions left at the crime scene could have been made by defendant's car was impermissible hearsay.

The State's expert opinion evidence established that the right front tire on the defendant's car was a Cooper "Falls Persuader." State Police forensic scientist David Brundage formulated his opinion by comparing the tire impression casts with the tire industry's manual "Tire Guide" which contained photographs of all brands of tires available on the market. In his investigation, he also contacted 110 tire manufacturers to determine the percentage of tires on the road today having the same characteristics as the one that made the impression. Mark Thomas, the director of mold operations at the Cooper Tire Company, also testified for the State and concluded that the impression cast was that of a "Falls Persuader" or a "Dean Polaris" tire. Defendant claims

that the introduction of such evidence violated his constitutional rights to confront and cross-examine witnesses under the sixth amendment.

Defendant claims that Officer Brundage's testimony based upon the manual "Tire Guide" was hearsay. Defendant's claim is meritless and must fall. There is no question that an expert may base his opinion on first-hand observation of facts or data. (*Wilson v. Clark* (1981), 84 Ill. 2d 186; *Skanlon v. Manning, Maxwell, & Moore, Inc.* (1970), 127 Ill. App. 2d 145.) Officer Brundage's opinion, formulated by comparing the plaster cast with the tire manual, undoubtedly falls within this category of admissible expert testimony.

Defendant also argues that Thomas' testimony was hearsay because he based his conclusion that the tire impressions left at the crime scene could only have been made by two models of a single manufacturer upon the research of a subordinate. Specifically, defendant objects to the following testimony elicited at trial:

> "Q. Were you able to determine whether any other tire manufacturer in America would—would manufacture a tire that could leave an impression such as that in exhibit 105?
>
> A. I had one of my people research that. Spent quite a few hours reviewing our drawings at Cooper as well as design guide books ***. Went back a number of years looking for similar products that could have made this and his response was that he didn't find anything else."

In reply, the State cites this court's opinion in *Wilson v. Clark* (1981), 84 Ill. 2d 186, in support of its contention that Thomas' reference to the opinion of the subordinate was not hearsay. In *Wilson*, this court adopted Rule 703 of the Federal Rules of Evidence and held that an expert witness may base his or her opinion on information which has not been admitted into evidence so

long as that information is reliable and is of a type reasonably relied upon by experts in that field.

The defendant correctly points out that Rule 703 does not create an exception to the hearsay rule. (*City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185.) This fact, however, is of no avail to the defendant, as defendant misapprehends the nature of the testimony. The testimony by Thomas is not offered for the truth of the matter asserted and therefore cannot be hearsay. Rather, the statement was admitted for the limited purpose of explaining the basis of his opinion. (*People v. Anderson* (1986), 113 Ill. 2d 1, 12.) Thus, no error was committed in admitting Thomas' expert testimony.

## Improper Closing Argument

The defendant next contends that several statements in the prosecutor's closing argument were improper and deprived him of a fair trial. Although defendant failed to raise objections to these comments during trial, we find that the prosecutor improperly overstated the evidence and review under plain error. See *People v. Linscott* (1991), 142 Ill. 2d 22 (applying plain error to prosecution's overstatement of hair comparison evidence).

First, defendant alleges that the prosecutor repeatedly misstated the fiber-comparison testimony of the State's forensic expert by stating that it conclusively established that Amy Schultz had been in defendant's car. Specifically, the defendant objects that the prosecutor told the jurors:

"In every single case the fibers found on Amy's sock shoes and underpants and shorts, shirt were consistent with the fibers from the defendant's car carpeting and dissimilar to all the carpets in her home environment and in her grandparents' house and the vehicles that they drive and in the business where her father works, so there can be no doubt that she got them from there.

They came from one place. Those fibers on her clothing came from the defendant's car.

* * *

The red shorts are a very big part of this case. *** Mr. Bisbing [defense expert witness] didn't examine the shorts at all, and we know from Ken Knight's testimony that fibers from the shorts were found in the passenger side of the car.

* * *

This evidence doesn't stand alone. It can be considered together with the carpet fibers on her clothing, the seat fabric fiber on her shirt, the dog hair all over her clothes, the foam rubber on her clothing, the defendant's tire impressions being the—the same as that found near Amy, and the clothing fibers from Amy's shirt and shorts which were deposited in the front passenger side area of the car.

* * *

You know, with regard to the evidence in the car that Amy was in there, you know what's uncontradicted in this case? The evidence that the red polyester fibers from her shorts were found in the passenger side area of the defendant's car. That is fibers just like them,—uncontradicted because the defense expert didn't look at them."

Defendant argues that these misstatements deprived him of his right to a fair jury trial and constitute reversible error. Defendant cites *People v. Linscott* (1991), 142 Ill. 2d 22, and *People v. Giangrande* (1981), 101 Ill. App. 3d 397, in support of his contention.

In *Linscott*, the State relied on three pieces of evidence to convict defendant of the victim's murder: (1) a dream defendant recounted to police that very closely paralleled the crime; (2) head and pubic hairs found in the victim's apartment and on her body that were consistent with defendant's head and pubic hair; and (3) the results of blood-typing tests. This court reversed the

defendant's conviction on the basis of certain improper prosecutorial arguments. *Linscott*, 142 Ill. 2d 22.

In that case, the State's evidence established that hairs found in the victim's apartment were "consistent with" the defendant's hairs. As in this case, the State's expert could not conclusively identify the hairs as originating from the defendant. Despite the expert witness' testimony to such effect, the prosecutor argued to the jury that " 'the rug in the area where Karen was laying [*sic*] was ripped out sometime later, rolled up and shipped to the laboratory. And that another group of hairs were obtained. The head hairs of Steven Linscott.' " *Linscott*, 142 Ill. 2d at 30.

The prosecutor also distorted the mathematical probability regarding the hair-comparison evidence. Despite the lack of foundation, the prosecutor argued that the odds of another individual having hair with the same characteristics as defendant's hair were about 1 in 3 million. (*Linscott*, 142 Ill. 2d at 33.) This court found that "these statements about the hair-comparison evidence, when considered by the jury which heard defendant testify that he had a dream on the night of the victim's death paralleling the events of her death in some respects, so prejudiced defendant's rights that they alone are reversible and require remanding the cause for a new trial." *Linscott*, 142 Ill. 2d at 34.

Similarly, in *People v. Giangrande* (1981), 101 Ill. App. 3d 397, the prosecutor overstated the evidence arguing that defendant's hair had been found at the crime scene, when the State's expert testified only that hairs from the crime scene could have originated from the defendant. (*Giangrande*, 101 Ill. App. 3d at 402-03.) The appellate court found such arguments improper and reversed the conviction stating that it could not conclude "that the closing argument comments of the prosecutor

did not result in substantial prejudice to defendant."
*Giangrande*, 101 Ill. App. 3d at 403.

In the present case, we are of the opinion that the prosecutor's overstatement of the fiber-comparison evidence was also improper. Prosecutorial misconduct in closing argument warrants reversal and a new trial, however, only if the improper remarks resulted in substantial prejudice to the defendant. (*People v. Baptist* (1979), 76 Ill. 2d 19.) In other words, the comments must have constituted a material factor in the conviction. *People v. Linscott* (1991), 142 Ill. 2d 22, 28.

We do not find that the remarks in this case substantially prejudiced the defendant. Unlike *Linscott* and *Giangrande*, the evidence in this case was not closely balanced. The State presented an overwhelming volume of circumstantial evidence: the tire print found by the crime scene was consistent with defendant's car's tire; the dog hair on the victim's clothing was consistent in all respects with the defendant's dog's hair and the dog hair found in his car; the foreign fibers found on the victim's clothing were consistent with the carpeting and upholstery in defendant's car; the clothing fibers found in the defendant's car were consistent with the fibers in the victim's clothing; finally, the pubic hair found on the victim were consistent with the pubic hair standards obtained from the defendant. Given the amount of evidence, it is implausible to think that the prosecutor's remarks could have been a material factor in the conviction. In this case, the jury would not have reached a different result, even if the prosecutor had not made the remarks. (*Baptist*, 76 Ill. 2d at 28-30.) Accordingly, defendant was not denied a fair trial and we will not disturb the conviction.

In light of the foregoing analysis, several of defendant's other contentions regarding improper statements made in closing argument must fall. Those comments did

not substantially prejudice the defendant and would not have affected the outcome of the trial even had they not been said.

## ERRORS AT SENTENCING

Defendant also claims that several errors made during sentencing require this court to vacate his death sentence. We find no merit to defendant's allegations.

### Ineffective Assistance of Counsel

First, defendant argues that he was deprived of his right to the effective assistance of counsel when his attorney failed to move to suppress statements allegedly obtained in violation of defendant's fifth and sixth amendment rights at the death penalty hearing. The defendant purportedly made the statements in question to law enforcement personnel after his Federal arrest for sniping in Glacier National Park, and while he was incarcerated.

In aggravation at the death penalty hearing, FBI Agent Brent Thueson testified that after placing defendant under arrest for sniping, he asked defendant if he had left any animal carcasses in the woods. Agent Thueson was concerned that the carcasses would attract grizzly bears and pose a danger to tourists. Defendant initially stated that he would not answer that question. On further questioning, however, defendant told a ranger where a deer carcass could be found. When Agent Thueson again expressed his concerns about the bears being attracted to carcasses and being a danger to park visitors, defendant responded, "That was their problem." Defendant argues that the persistent questioning by the law enforcement officials violated his right to remain silent and rendered his subsequent statements and the fruits of those statements inadmissible.

Defendant also takes exception to certain comments elicited by the prosecutor on cross-examination of defendant's mitigation witness. In mitigation, defendant called Bradley Roux, his case manager at Leavenworth Penitentiary. On cross-examination, the prosecutor elicited from Roux that defendant had stated to the Federal probation officer who prepared his Federal presentence report that "[h]e likes solitary living and actually enjoys jail because he doesn't mind being alone." At the time of the interview with the Federal probation officer, defendant was in custody and represented by counsel. Defendant's counsel, however, was not present, nor was defendant cautioned that anything he said could be used against him in court. Thus, defendant argues, his statement that he "enjoys jail" was taken in violation of his fifth and sixth amendment rights to counsel and to remain silent.

On appeal, defendant argues that the failure to suppress these statements resulted in prejudice to defendant which affected the outcome of the death penalty. Defendant contends that such a failure to move to suppress in this case deprived him of his right to the effective assistance of counsel; thus, his death sentence should be vacated.

We find defendant's arguments unpersuasive. In order for defendant to demonstrate that he was deprived of the effective assistance of counsel, he must show that: (1) his attorney's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of that proceeding would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065.) Even assuming that defendant can meet the first prong of the *Strickland* analysis, defendant clearly fails to satisfy the second part of the test.

28

It is implausible to think that any of defendant's trial counsel's alleged errors resulted in actual prejudice such that the outcome of the sentencing phase would have been different. At the close of the guilt phase, the jury had found defendant guilty of first degree murder, aggravated kidnapping, and aggravated criminal sexual assault. At the eligibility phase, the jury found the defendant eligible for the death penalty because in the course of murdering Amy Schultz, he also committed the offense of aggravated kidnapping as well as the offense of aggravated criminal sexual assault. In addition to these two felonies committed during the course of the murder on which to predicate death penalty eligibility, the jury found a third statutory aggravating factor. The victim in this case was under 12 years of age and her death resulted from exceptionally brutal behavior indicative of wanton cruelty. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).

In addition to the three statutory aggravating factors and the utter brutality of the crime, the jury heard testimony of numerous other aggravating factors including: evidence of defendant's conviction for attempting to kill an employee of the National Park Service, evidence of defendant going AWOL on two separate occasions while in the United States Marine Corps, and evidence of his violent nature and general disregard for the law. The evidence in aggravation was staggering, even without the contested statements. In light of the overwhelming evidence in aggravation and defendant's failure to present sufficient evidence in mitigation, there is no reasonable probability that but for counsel's alleged errors, the result of the trial would have been different.

### Improper Argument at Sentencing

We also reject defendant's contention that the prosecutor's closing argument at sentencing deprived him of a

fair and reliable death penalty hearing. The prosecutor argued that "[t]he time to impose punishment upon the defendant is here. He claims to like jail. So sentencing him to jail would be a reward and not a punishment." Defendant argues that the prosecutor improperly urged the jurors to consider evidence of defendant's good adjustment to prison as a basis for a sentence of death as this was actually relevant evidence in mitigation of punishment.

As discussed above, however, there was overwhelming evidence presented at the sentencing phase of the trial. Even if the remark during closing argument was improper, we do not believe that it substantially prejudiced the defendant. Thus, defendant's claim must fall.

## Residual Doubt and Mercy Instructions

The defendant next argues that the trial court denied him a fair sentencing hearing under Illinois law and the eighth and fourteenth amendments when it refused his tendered instructions concerning the applicability of residual doubt and mercy. We find the defendant's claim meritless. The trial court may properly refuse a defendant's request for an instruction on nonstatutory mitigation if the court instructs the jurors that they are to consider any other reasons for imposing a sentence less than death. (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 40.) The trial judge instructed the jury to consider "[a]ny other reason supported by the evidence why the defendant should not be sentenced to death." The instructions given allowed the jury to consider all reasons why defendant should not be sentenced to death including residual doubt and mercy. This instruction comports with Illinois law and the eighth and fourteenth amendments; thus, defendant's claim must fail. *Spreitzer*, 123 Ill. 2d at 40-41.

### Alternative Sentences

Defendant also contends that he was denied his State and Federal right to a fair and reliable sentencing hearing because the trial court refused to instruct the jury on the alternative sentences available under Illinois law. This court, however, has previously stated that, in a single murder case, the trial court need not tell a sentencing jury all the possible terms of imprisonment a court might impose on a defendant if the jury does not sentence him to death. (*People v. Bean* (1990), 137 Ill. 2d 65, 116.) We find no occasion to reconsider this holding; therefore, this claim must also fall.

Finally, the defendant alleges three additional arguments regarding sentencing that are without merit and are summarily rejected: (1) that the trial court violated defendant's rights by refusing to allow him the right of allocution at the death penalty hearing; (2) that the Illinois death penalty is violative of the eighth and fourteenth amendments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation; and (3) that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. In *People v. Gaines* (1981), 88 Ill. 2d 342, this court held that a defendant does not have a right of allocution at a death penalty hearing. We find defendant's argument for reconsideration of this holding unpersuasive. Similarly, this court has on numerous occasions rejected the assaults on the death penalty that the defendant brings. (See, *e.g., People v. Simms* (1991), 143 Ill. 2d 154.) Again, defendant has not presented any persuasive reason to reconsider those decisions.

### CONCLUSION

For the reasons set forth above, we affirm defend-

ant's conviction and sentence of death. We hereby direct the clerk of this court to enter an order setting Wednesday, March 10, 1993, as the date on which the sentence of death entered by the circuit court of Richland County shall be carried out. The defendant shall be executed in the manner provided by law (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*Affirmed.*

JUSTICE CLARK, dissenting:

Because I believe that the evidence against defendant Cecil Sutherland, while certainly suspicious, was far from "overwhelming" (155 Ill. 2d at 18), and because the defendant failed to receive a trial free from prejudicial error, I would reverse defendant's convictions and remand for a new trial. Thus, I respectfully dissent.

I begin with the areas in which the majority and I agree. The majority correctly explained the appropriate standard of review in this case. "When faced with a challenge to the sufficiency of the evidence, the relevant inquiry for the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (155 Ill. 2d at 17.) The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial.

At trial, David Brundage, an Illinois State Police forensic scientist, testified that the tire impressions found at the crime scene were "consistent" with two models of tires manufactured in North America: the Cooper "Falls Persuader," and the Cooper "Dean Polaris." Defendant's right front wheel had a Cooper "Falls Persuader"

on it. Consequently, Brundage was able to conclude that the tire impression "could have been made" by defendant's right front tire. (155 Ill. 2d at 9.) Along the same lines, Mark Thomas, manager of operations at Cooper Tire Company, concluded that the "probability" was "pretty great" that the same size tire as defendant's made the impression. However, Thomas acknowledged that there were a "significant" number of such tires on the road.

Kenneth Knight testified for the State that two pubic hairs found in the victim's rectal area "could have originated" from the defendant. Further, 34 dog hairs found on the victim's clothes "could have originated" from the defendant's black labrador, Babe.

With regard to the 29 gold fibers found on the victim's socks, shoes, underwear, shorts and shirt, Knight similarly testified that 28 of these 29 gold fibers "could have originated" from defendant's auto carpet. However, Knight acknowledged that he could not conclude that these gold fibers originated from defendant's auto carpet to the exclusion of all other auto carpets.

With regard to the 12 cotton and 4 polyester fibers found on the front passenger seat of the defendant's car, Knight concluded that the fibers displayed the same size, shape, and color of the fibers from the victim's shirt, and thus they "could have originated" from the shirt. In terms of the three polyester fibers found in defendant's car, Knight stated that they were consistent in diameter, color, shape and optical properties with the fibers from the victim's shorts, and thus they "could have originated" from the shorts.

Based on the above evidence, the majority concludes:

"Given the overwhelming and overlapping nature of the circumstantial evidence in this case, we are not prepared to say that the evidence is so unreasonable, im-

probable, or so unsatisfactory as to justify a reasonable doubt of defendant's guilt." 155 Ill. 2d at 18.

The majority's finding, namely, that the circumstantial evidence was "overwhelming," I believe is grossly in error. In my opinion, the sum total of all of this circumstantial evidence leads one to the less than convincing belief that it *"could have been"* the defendant who committed this brutal crime. Nearly half of the proffered circumstantial evidence has holes in it. With regard to the tire impression evidence, Mark Thomas *did not* state that the "probability" was "pretty great" that it was defendant's right front tire that made the impression near the crime scene but, rather, that the "probability" was "pretty great" that the same size tire as the defendant's made the impression. This is a distinction with a great deal of difference. Equally important is Thomas' concession that there were a significant number of such tires on the road.

In terms of the 12 cotton fibers found in the defendant's car which the State's expert, Kenneth Knight, stated could have originated from the victim's shirt, the defense expert Richard Brisbing noticed differences in the size and color of these cotton fibers. Thus, like the tire impression evidence, this evidence is not as convincing as the majority finds.

Consequently, because the circumstantial evidence suggesting that the defendant committed this crime was far from overwhelming, and because two prejudicial errors occurred which denied the defendant a fair trial, I would reverse defendant's convictions and remand for a new trial.

The first trial error involves the admission of knives which were found in defendant's possession at the time of his arrest. At trial, the State admitted into evidence a bayonet knife, a long knife with a jagged edge, and five other knives. The trial court admitted this evidence be-

lieving that it had "some slight probative value" and that it would not prejudice the defendant. (155 Ill. 2d at 19.) The majority agrees with the trial court, and states that "the choice of method of execution tends to indicate an affinity for such a weapon." (155 Ill. 2d at 20.) However, apparently none of these knives has been connected to this crime through forensic tests. Further, they were found in defendant's possession while he was at the Glacier National Park, not an unlikely place to find an individual carrying knives.

As the majority correctly notes, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. (155 Ill. 2d at 19.) A reviewing court will not disturb a trial court's determination absent an abuse of discretion. (*People v. Shum* (1987), 117 Ill. 2d 317, 353.) In this instance, assuming for the moment the probative value of these knives, I believe that their admission resulted in substantial prejudice to the defendant. The fact that knives were found in defendant's possession several months after the crime, in a location approximately 1,500 miles from the crime scene, and that they were in no way connected to the crime served only to overpersuade the jury that the defendant was a dangerous and violent individual. Thus, their prejudicial effect substantially outweighed their probative value, which was minimal at best.

The second error which I believe requires reversal of defendant's convictions involved improper statements by the prosecutor during closing argument. Based on *People v. Linscott* (1991), 142 Ill. 2d 22, and *People v. Giangrande* (1981), 101 Ill. App. 3d 397, the majority recognizes that the prosecutor overstated the circumstantial evidence regarding the gold fibers and the cotton fibers found on the victim's socks, shoes, and shorts, and in the defendant's auto, respectively. (155 Ill. 2d at 22-26.)

However, despite this error, the majority reasons that the improper characterization of the evidence did not result in substantial prejudice to the defendant. The majority concludes that because the evidence was not closely balanced, the prosecutor's improper remarks could not have been a material factor in defendant's convictions. (155 Ill. 2d at 25.) As noted earlier, I disagree with the majority's characterization of the evidence as "overwhelming," and firmly believe that regardless of whether the evidence was sufficient to support a conviction, it clearly was not so overwhelming as to render this prosecutorial error harmless.

For the reasons stated above, I respectfully dissent.

JUSTICE FREEMAN joins in this dissent.