KARLA MORGAN, Plaintiff-Appellee, v. JOSEPH S. DICKSTEIN *et al.,* Defendants-Appellants.

Fifth District    No. 5—95—0211

Opinion filed October 10, 1997.

KUEHN, P.J., dissenting.

Kim Roger Luther, Darren E. Daley, and Jennifer L. Stockton, all of Luther & Associates, of St. Louis, Missouri, for appellant Joseph S. Dickstein.

Mary Anne Mellow and Thomas J. Smith, both of Sandberg, Phoenix & von Gontard, P.C., of St. Louis, Missouri, for appellant Edward A. Utlaut Memorial Hospital.

Bruce N. Cook, of Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., of Belleville, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:

Defendants, Joseph S. Dickstein, M.D. (Dr. Dickstein), and Edward A. Utlaut Memorial Hospital (the Hospital), appeal from the order of the Bond County circuit court granting a motion for change of venue filed by plaintiff, Karla Morgan. On appeal, we consider whether the trial court abused its discretion by granting the motion. We reverse and remand.

■ Plaintiff filed her complaint on November 13, 1990, in Bond County, Illinois, against defendants, claiming damages as the result of the birth of her stillborn daughter. The events alleged in the complaint all occurred in Bond County, the Hospital is located in Bond County, and plaintiff lives in Bond County. Dr. Dickstein lives in

Montgomery County and has offices in both Bond County and Montgomery County. On December 8, 1994, plaintiff filed a motion for change of venue pursuant to section 2—1001.5 of the Code of Civil Procedure (735 ILCS 5/2—1001.5 (West 1994)), which provides in pertinent part as follows:

"(a) A change in venue in any civil action may be had when the court determines that any party may not receive a fair trial in the court in which the action is pending because the inhabitants of the county are prejudiced against the party, or his or her attorney, or the adverse party has an undue influence over the minds of the inhabitants.

\* \* \*

(e) When a change of venue is granted, it shall be to some other convenient county to which there is no valid objection."

Plaintiff alleged in her motion for change of venue that she is a Caucasian female married to an African-American male, that her lawsuit against defendants arises out of events surrounding the birth of their mixed-race child, and that as "the result of the highly publicized and widely and commonly known activities of the Ku Klux Klan [KKK] in the area, plaintiff feels she is unable to receive a fair trial at the Bond County Courthouse." Plaintiff attached to the motion her own affidavit and several newspaper articles concerning a KKK rally that had been scheduled and then cancelled for the Bond County area.

Both defendants filed responses objecting to any change of venue, pointing out that plaintiff had not complied with the statute, in that she did not file affidavits from "at least 2 other reputable persons residing in the county." 735 ILCS 5/2—1001.5(b) (West 1994). Shortly thereafter, plaintiff filed affidavits signed by Christine Voss and Reba Voss. Christine's affidavit stated, in relevant part, that she owned the "Main Street Doll Shop, located across the street from the Bond County Courthouse in Greenville, Illinois," and that she was aware of the recent newspaper articles about and activities of the KKK in Bond County. Her affidavit further stated, "[A]s a result of said publicity, publications and activity, I believe Karla Morgan cannot receive a fair trial in Bond County." Reba Voss's affidavit alleges the same facts and conclusions as stated in Christine's affidavit, except Reba owns a different business in Greenville, Illinois.

On January 5, 1995, the trial court entered an order granting plaintiff's motion and transferring the case to Madison County, Illinois. In its January 5 order, the court found that the KKK activities in Bond County and the publicity surrounding it made it "unlikely that the plaintiff could receive a fair trial in Bond County."

The court acknowledged in its order that the attorneys for both defendants argued that the issue was premature since *voir dire*, the proper vehicle for determining juror prejudice, had not yet been conducted. The court rejected defendants' arguments and stated: "[T]he Court finds it highly unlikely that it could obtain thoroughly candid responses from venire persons whether in open court or in chambers. Furthermore, the publicity about the original rally, later cancelled due to lack of need, only to be later scheduled again for next week[,] suggests to the Court that racial tensions will likely be running very high."

Both defendants filed motions to reconsider the transfer to Madison County. In support of the motions to reconsider, defendants submitted counteraffidavits, including the affidavit of Basil Sitzes, the KKK's Grand Titan. In Sitzes' affidavit, he stated that after meeting with Bond County officials prior to the rally which had been scheduled for Bond County, he "cancelled the rally because [he] did not find any racial problems justifying the rally." Defendants also filed the affidavit of Frank Thompson, who stated that he believed that "the vast majority of residents of Bond County would not be prejudiced against" a black person and that "a person can receive a fair trial in Bond County regardless of their race or religion."

Defendants also submitted the discovery depositions of Reba Voss and Christine Voss, the two persons who signed affidavits in support of plaintiff's request to transfer the case out of Bond County. Christine testified in deposition that she believed that plaintiff cannot receive a fair trial in Bond County because people single her out as the "white woman" who is married to "that black man." Christine based her opinion upon her feeling that the people of Bond County who know of plaintiff and who know that she is married to a black man will not be able to set aside their prejudice against plaintiff. Reba Voss admitted in her deposition testimony that she does not personally know any KKK members and that she does not know of any specific racial prejudice directed at plaintiff or her husband. Reba testified that she knows some people in the county who are very prejudiced and who would be unfair to plaintiff simply because plaintiff is a white woman who is married to a black man.

It is clear that the conclusions reached by both Christine and Reba are based upon their own personal experiences of living in Greenville, the county seat of Bond County. As accurate as their perceptions may be, however, they are speculative in that neither Christine nor Reba talked to the *venire* panel from which plaintiff's jury would be selected. It is entirely possible that the randomly selected *venire* panel will not contain any people who have any knowledge of or preconceived notions about plaintiff or her lawsuit.

In the course of the hearing on defendants' motions to reconsider, the court determined that plaintiff had not paid the cost of transferring the case to Madison County. Accordingly, the court found the January 5, 1995, order to be void. See 735 ILCS 5/2—1001.5(h) (West 1994). On March 7, 1995, the trial court entered an order transferring the case to St. Clair County. In deciding that plaintiff could not receive a fair trial in Bond County due to the prejudice of its inhabitants, the court adopted its reasoning from the January 5, 1995, order, *i.e.*, that *voir dire* would not be necessary since it was "highly unlikely" that the potential jurors would give "thoroughly candid responses."

■ We find that the court's action in transferring this case out of Bond County on the basis of this record, without the benefit of *voir dire* to determine whether a panel of objective and fair jurors could be found, was an abuse of the court's discretion. While the statute authorizing a change of venue to another county does not specifically require the court to conduct *voir dire* of the potential jurors, the process of questioning those jurors will typically be the most accurate method for determining whether prejudice has actually infected the population of the county to a degree that a fair and impartial jury cannot be found. See *Hockett v. Dawdy*, 180 Ill. App. 3d 491, 495-96 (1989) (recognizes that the most valuable tool for determining local attitudes about a party is found in the process of *voir dire*); *People v. Boyle*, 161 Ill. App. 3d 1054, 1070 (1987) (same).

The problem with plaintiff's request for a change of venue is that it is not supported by any *evidence* from which the court could reasonably determine that plaintiff "may not receive a fair trial" in Bond County due to the prejudice of the Bond County residents against plaintiff. See 735 ILCS 5/2—1001.5 (West 1994). At most, the court could determine that prejudice against blacks exists in Bond County. Without some evidence to show a reasonable likelihood that an impartial jury cannot be found, the decision to transfer the case was based merely upon speculation and conjecture, which is improper. *People v. Sutherland*, 155 Ill. 2d 1, 14 (1992); *People v. Farris*, 82 Ill. App. 3d 147, 152 (1980). Even where the evidence of prejudice is much stronger than this, such as in a case where surveys have been conducted indicating potentially harmful publicity specifically naming a party, that evidence, standing alone, without a corollary finding that a panel of 12 fair and impartial jurors cannot be found, is not sufficient to establish proof of community prejudice to warrant a change in the place of trial. *Boyle*, 161 Ill. App. 3d at 1070; *People v. Knippenberg*, 70 Ill. App. 3d 496, 499 (1979).

We find it troubling that the trial court specifically found it

"highly unlikely that it could obtain thoroughly candid responses from *venire* persons whether in open court or chambers" (emphasis added) without ever questioning a single juror.

> "The purpose of *voir dire* is to assure the selection of an impartial panel of jurors who are free from bias or prejudice. [Citations.] Under our Supreme Court Rule 234 [citation], the primary responsibility for initiating and conducting the *voir dire* examination lies with the trial judge [citation], and the scope and extent of the exam rests within his discretion [citation]. An abuse of this discretion will be found only if, after reviewing the record, it is determined that the judge's conduct thwarted the selection of an impartial jury." *Kingston v. Turner*, 115 Ill. 2d 445, 464-65 (1987).

Here, defendants argued that plaintiff's request to transfer the case out of Bond County was based merely upon speculation and that the only way to test plaintiff's allegation of prejudice was to question potential jurors. Over defendants' valid objections, the trial court transferred this case to St. Clair County, based solely upon the possibility of KKK activity in the county, the publicity about a possible KKK rally, and the generalized and vague feelings of two residents that plaintiff could not get a fair trial in Bond County.

Plaintiff's allegations concerning the KKK are not in any way connected to plaintiff or this lawsuit, and plaintiff has no evidence of such a connection, with the exception of a huge leap in logic that if KKK activity exists, then the residents of Bond County must be so prejudiced against plaintiff for being a white woman married to a black man that they could not possibly give her a fair hearing on the issue of the wrongful death of her mixed-race infant. Such a leap is unfounded. Plaintiff's evidence from Christine and Reba Voss is also purely speculative without some proof for their belief that the residents of the county are so prejudiced against plaintiff that an impartial jury cannot be found in Bond County.

The lack of any evidence in support of plaintiff's conclusions clearly mandates a finding that the trial court abused its discretion in granting plaintiff's motion for change of venue. Based upon our holding that the trial court abused its discretion in transferring the case out of Bond County, we need not address defendants' additional arguments that the trial court abused its discretion in transferring the case to St. Clair County instead of to some other convenient county.

For all of these reasons, we reverse and remand for further proceedings consistent with this opinion.

Reversed and remanded.

WELCH, J., concurs.

PRESIDING JUSTICE KUEHN, dissenting:

It appears that litigants can no longer escape trial's commencement in venues inhabited by people likely to be unfair to their pursuits. Today's decision immanently alters their statutory right to obtain a venue transfer prior to trial.

The change-of-venue statute's design to bypass a potentially unfair juror base before trial begins hereafter yields to an opponent's right to conduct *voir dire* examination. Parties advantaged by an area's prejudice will simply raise the objection that this case validates. Thus, venue-change requests universally fall prey to demands for the very thing they seek to avoid—the start of trial in a hostile venue.

The majority reasons that reputable inhabitants' perceptions of prejudice at large are speculative of the prejudice that may or may not infect a litigant's specific jury panel. Absent discourse with actual venire members, it is impossible to assign actual prejudice to them. The majority notes that an accurate measure of actual prejudice infecting the specific jury panel compels *voir dire* of that panel. This, of course, is absolutely true. It is mindless, however, of the change-of-venue statute and its express purpose.

Defendants' assertion of the right to conduct *voir dire* cannot constitute a valid objection to venue change without the sacrifice of the statute's design and the contradiction of its express terms. If a party's right to venue change must await a jury panel, *voir dire* examination, and discovery of actual prejudice in the minds of jury panel members, the right is effectively abrogated.

The majority's reasoning embraces the notion that randomly selected jurors might not harbor the same prejudice known to exist among the inhabitants at large. It follows that *voir dire* examination becomes a necessary adjunct to any decision to change venue. To obtain a venue change, a party must commence trial and expose a degree of actual juror prejudice incapable of being culled from the jury. Clearly, this is not what our law contemplates. If it did, the change-of-venue statute would be pointless.

The change-of-venue statute contemplates a determination that sufficient prejudice infests the potential juror base to jeopardize the

discovery of unbiased, free-thinking jurors necessary to fair trials with just outcomes. The statute authorizes the trial court to decide whether an area's prejudice toward a party is pervasive enough to *potentially* evade safeguards in the jury selection process. The statute's procedures exist in the recognition of prejudice's insidious nature. Its machinery is designed to avoid *voir dire* examination. It allows a party to evade *voir dire's* test of conscience and candor in venues where it is known in advance of trial that jurors will be drawn from a populace that harbors widespread prejudice toward that party.

The trial court, in the exercise of sound discretion, must decide *in advance of trial* whether prejudice exists and, if so, whether its *potential* impact warrants departure from the forum without an attempt to impanel a jury. The decision rests upon whether pretrial affidavits convince the trial court that enough prejudice exists to conclude that a party *may not* receive a fair trial in the venue. The touchstone is not, as the majority states, "whether prejudice has *actually* infected the population of the county to a degree that a fair and impartial jury *cannot* be found." (Emphasis added.) 292 Ill. App. 3d at 826.

The majority's reasoning relies on cases that are inapposite. Where trial courts exercise discretion to forego venue change and proceed to trial, the *voir dire* process is a valuable tool with which to assess discretion's abuse. The cases stand for nothing more. They certainly do not confer the right to demand *voir dire* examination to parties that oppose a venue-change request.

As much as I disagree with the majority's view of the law, I disagree more with its view of the facts. The majority believes that Judge Herndon abused his discretion. In effect, it concludes that no reasonable decision-maker would adopt the view taken by Judge Herndon. The problem with his decision, we are told, is a total absence of evidence to support his belief that Karla Morgan may not receive a fair trial in Bond County.

In my view, this record not only supports trial in a different venue, it compels it.

First, this is not a suit to recover damages for the death of a stillborn baby. It is a suit to recover for Karla Morgan's loss of childbearing organs, a circumstance that deeply impacts her marriage to John Morgan. Bond County inhabitants' attitudes toward the Morgan marriage bear directly on the lawsuit.

The record presents the following circumstances based on evidence in the form of affidavits and exhibits in support and opposition of the venue-change petition.

Karla Morgan is Caucasian. Bond County people are mostly Caucasian. Only 2% of Bond County inhabitants are black-skinned and Karla Morgan is married to one of them.

The Morgan marriage is decidedly uncommon for the area. It is so novel that people simply identify Karla Morgan as "the white woman that married that black man." On occasion, her epithet assumes an overtly negative tone. Some people simply refer to Karla Morgan as "that nigger lover."

Whether inhabitants identify plaintiff by a politically correct epithet or reduce it to a simple racial slur, the characterization unmistakably implies the prejudgment of her marriage's worth, a marriage that can no longer beget children because of the alleged malpractice.

The Morgans' marriage, their daughter's death, and their lawsuit against the area's only hospital are common topics of discussion among the populace. People can be heard "talking distinctively about the Morgans and how it is a blessing that their baby died, because it was going to be half and half."

Without question, the community exhibits a widespread individualized prejudice toward Karla Morgan and her lawsuit. It has as its core a ubiquitous disapproval of Karla Morgan's interracial marriage. It manifests itself in repeated comments about Karla Morgan, her child's death, and her lawsuit. These comments speak to prospective jurors who believe that her child's death bestowed a blessing and who believe that her lawsuit is a spurious assignment of blame. The specific animus toward plaintiff and her interracial marriage coincides with a broader community prejudice toward blacks in general, which brings me to my final point.

The majority totally misses the mark in its discussion of Ku Kluxery and this record. The Ku Klux Klan rally was designed to educate Bond County inhabitants on the Klan's creed of hatred toward integration and its evils. Interracial marriage is one of those evils. The Grand Titan of the Federation Klans-Knights of the Ku Klux Klan cancelled the rally because "after meeting with officials and discussing the racial situation with various individuals *** [he] did not find any racial problems justifying the rally."

The Ku Klux Klan's Grand Titan is a specialist among specialists in racial prejudice. He lives by a creed steeped in a tradition of hatred toward integration—a creed that debases interracial marriage. His affidavit's assessment of Bond County attitudes toward interracial marriage is a compelling part of this record. His cancellation of Klan activity in Bond County offers an eerie confirmation of the affiants' perceptions. After an investigation of the area's racial situation, the Grand Titan determined that Klan activity in Bond County was unnecessary.

When the Grand Titan of the Ku Klux Klan observes a racial

pearl, it is quite reasonable to imply the presence of racial poison. The Grand Titan's stamp of approval for an area's racial views depicts an area where a white woman married to a black man *may not receive a fair trial.* I believe a reasonable decision-maker might well adopt the approach taken by Judge Herndon and allow Karla Morgan a different juror base.

For the reasons stated, I dissent.